# GREAT NORTHERN RAILWAY COMPANY *v.* STEINKE ET AL.

## CERTIORARI TO THE SUPREME COURT OF THE STATE OF NORTH DAKOTA.

No. 152.  Argued December 5, 1922.—Decided February 19, 1923.

1. The Act of March 3, 1875, granting railroad rights of way and station grounds in the public lands, should receive a more liberal construction than acts making private grants or extensive grants of land to railroads.   P. 124.

2. Where a railroad, under this statute, with approval of the Land Department, secured station grounds in lieu' of others nearby, previously selected, persons who were without interest in the premises at the time cannot object that the second selection was void because the first one exhausted the right.   P. 125.

3. In a suit by a railroad company to quiet its title to lands included in a station-grounds map which was filed, amended and refiled and then approved by the Secretary of the Interior, *held* that this Court could not take judicial notice of the records of the General Land Office to ascertain the nature and extent of the amendment, nor assume that it was insubstantial; and that, in the absence of evidence on the subject, the rights of the railroad could relate back only to the date of refiling.   P. 125.

4. Where land embraced in a map duly filed and approved, " subject to all valid existing rights," under the above act, is subject, at the time of filing and approval, to a preliminary homestead entry, the railroad gets a right for station purposes subject only to the qualification that the rights of the homesteader are not to be disturbed without due compensation, and this qualification disappears when the entry is relinquished and canceled, leaving the railroad's rights as complete as if the entry had never existed.   P. 126.

5. The title of a railroad to station grounds under the above act of 1875 cannot be affected by the neglect of the local land officers to note the disposal on the plat and tract-book in their office.   P. 129.

6. Purchasers of lots laid out on land included in their grantor's entry and patent but adjacent to the right of way of a railroad constructed over the patented subdivision, who know that the railroad claims rights older than those of their grantor, are bound to enquire and chargeable with notice of proceedings recorded in

the General Land Office, whereby the railroad obtained a senior title to such adjacent land for station purposes, under the Act of 1875, *supra.* P. 131.

So *held,* where the railroad right was not excepted in their grantor's patent and certificate.

7. A grant of land under the Act of 1875 is upon implied condition that it be used for the *quasi* public purposes named in the act, and neither laches of the railroad grantee, nor local statutes of limitation, can invest individuals with any interest in the tract, or a right to use it for private purposes, without the sanction of the United States. P. 132.

183 N. W. 1013, reversed

CERTIORARI to a decree of the Supreme Court of North Dakota affirming a decree of a trial court against the Railway Company in a suit to determine conflicting claims to a parcel of land.

*Mr. C. J. Murphy,* with whom *Mr. M. L. Countryman* and *Mr. T. A. Toner* were on the brief, for petitioner.

No brief filed for respondents.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This is a suit by the Great Northern Railway Company to determine conflicting claims to a small tract of land adjoining its right of way at Springbrook, North Dakota. That company claims the tract under a grant of station grounds made by the United States to the St. Paul, Minneapolis and Manitoba Railway Company, and the defendants claim the same under a patent from the United States to Philander Pollock. The defendants prevailed in the trial court and in the Supreme Court of the State. 183 N. W. 1013. A writ of certiorari brings the case here. 257 U. S. 629.

At a time when the lands in that vicinity were public lands the St. Paul, Minneapolis and Manitoba Railway Company, being duly qualified so to do, sought and se-

cured a right of way through the same under the Act of
March 3, 1875, c. 152, 18 Stat. 482, and constructed its
road within and along such right of way.   At the same
time and in the same way it sought and secured certain
lands two miles east of the present site of Springbrook for
station grounds.   Afterwards it changed its station to a
point adjacent to such site and proceeded to give up the
original station grounds and to select others, including the
tract in controversy, in their stead.   It made the requisite
survey of the new grounds, prepared a map thereof and
on January 12, 1900, filed the map in the local land office,
whence it was to be transmitted to the General Land Office
and laid before the Secretary of the Interior.   The map
was returned to the Company for amendment in particu-
lars not shown in the record, was amended accordingly,
and on July 18, 1900, was refiled in the local land office.
The local officers then transmitted it to the General Land
Office, and on October 18, 1900, the Secretary of the In-
terior approved it " subject to all valid existing rights."
On being advised of the Secretary's approval, the local
officers should have noted the disposal on the township
plat and tract book in their office, but this was not done.
The approved map and all papers relating thereto were
preserved in the General Land Office in the usual way,
and a certified copy of the map and of some of the papers
was produced in evidence at the trial.

On January 12, 1900, when the map was first filed in the
local land office, the tract in question was public land and
free from any claim, but before July 18, 1900, when the
map was refiled, the tract was included, with other land,
in a preliminary homestead entry made by John Welo.
That entry remained intact until May 13, 1901, and was
then relinquished by Welo and canceled.   On August 19,
1902, the tract was included, with other land, in a pre-
liminary homestead entry made by Philander Pollock, and
on June 1, 1903, he released the forty-acre subdivision con-

taining this tract from that entry and made another and unrelated entry of the same subdivision. Under the latter entry a patent for the full subdivision was issued to him on February 28, 1906.

Pollock and others, whom he interested in the project, platted the greater part of the forty-acre subdivision, including the tract in question, as a townsite. The defendants purchased from them some of the lots, which, as platted, cover part of this tract.

The station grounds shown on the map approved by the Secretary of the Interior consist of a long strip of land one hundred feet wide extending along one side of the right of way at Springbrook. The tract in question is part of that strip and is in close proximity to the tracks and depot.

The rights of the St. Paul, Minneapolis & Manitoba Railway Company in the road, right of way, station grounds, etc., passed to the plaintiff, the Great Northern Railway Company, in 1907.

The Supreme Court of the State, in rejecting the plaintiff's claim under the grant of station grounds and sustaining the defendants' claim under the patent to Pollock, put its decision on two independent grounds. One was that when the map was refiled in the local land office, and when it was approved by the Secretary of the Interior, the tract in question was included in Welo's preliminary homestead entry, and therefore was not subject to disposal under the Act of 1875, and that the Secretary excluded it from his approval by making the latter " subject to all valid existing rights." The other was that thereafter the land officers permitted Pollock to make an entry of the forty-acre subdivision containing this tract, issued to him a certificate of final entry making no reference to the railroad company's claim and gave him a patent purporting to cover the entire subdivision, and that the defendants purchased from Pollock in good faith relying on the final certificate and patent so issued to him.

The pertinent provisions of the Act of 1875 are as follows:

" That the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station-buildings, depots, machine shops, side-tracks, turn-outs, and water-stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road."

" Sec. 3. That the legislature of the proper Territory may provide for the manner in which private lands and possessory claims on the public lands of the United States may be condemned; and where such provision shall not have been made, such condemnation may be made in accordance with section three of the act entitled [an act to amend an act entitled] 'An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the same for postal, military, and other purposes, approved July first, eighteen hundred and sixty-two,' approved July second, eighteen hundred and sixty-four.

" Sec. 4. That any railroad-company desiring to secure the benefits of this act, shall, within twelve months after the location of any section of twenty miles of its road, if the same be upon surveyed lands, and, if upon unsurveyed lands, within twelve months after the survey thereof by

the United States, file with the register of the land office
for the district where such land is located a profile of its
road; and upon approval thereof by the Secretary of the
Interior the same shall be noted upon the plats in said
office; and thereafter all such lands over which such right
of way shall pass shall be disposed of subject to such right
of way: *Provided,* That if any section of said road shall
not be completed within five years after the location of
said section, the rights herein granted shall be forfeited
as to any such uncompleted section of said road.

"Sec. 5. That this act shall not apply to any lands
within the limits of any military, park, or Indian reserva-
tion, or other lands specially reserved from sale, unless
such right of way shall be provided for by treaty-stipula-
tion or by act of Congress heretofore passed."

As with other public land laws, the Secretary of the
Interior was empowered to prescribe regulations for car-
rying the act into effect. Such regulations were pre-
scribed. Those in force at the times to which the con-
troversy relates were promulgated November 4, 1898. 27
L. D. 663.

In some respects the act was loosely drafted, but
through a long course of administration in the land de-
partment and many adjudications in the courts its mean-
ing and effect have come to be pretty well settled. Its
purpose was to enhance the value and hasten the settle-
ment of the public lands by inviting and encouraging the
construction and operation of needed and convenient lines
of railroad through them. Nothing was granted for pri-
vate use or disposal, nor beyond what Congress deemed
reasonably essential, presently or prospectively, for the
*quasi* public uses indicated. Because of this, the act has
been regarded as requiring a more liberal construction
than is accorded to private grants or to the extensive land
grants formerly made to some of the railroads. *United
States* v. *Denver & Rio Grande Ry. Co.,* 150 U. S. 1, 8,

14. And see *Kindred* v. *Union Pacific R. R. Co.,* 225 U. S. 582, 596; *Nadeau* v. *Union Pacific R. R. Co.,* 253 U. S. 442, 444. There is no provision in the act for the issue of a patent, but this does not detract from the efficacy of the grant. The approved map is intended to be the equivalent of a patent defining the grant conformably to the intendment of the act, *Noble* v. *Union River Logging R. R. Co.,* 147 U. S. 165, and to relate back, as against intervening claims, to the date when the map was filed in the local land office for transmission through the General Land Office to the Secretary of the Interior. *Stalker* v. *Oregon Short Line R. R. Co.,* 225 U. S. 142.

In the state court the defendants sought to make the point that when the company secured the station grounds two miles east of the present site of Springbrook it exhausted its right under the act and therefore could not select or take the new grounds. But the point is without merit. The company did not try to hold the original grounds and also to secure the new ones. As shown by the map, it surrendered the former and sought the latter in their stead. By approving the map the Secretary of the Interior assented to the change,—presumably because it appeared to be one which would subserve the interests of the public as well as those of the company. It was the practice of the land department to permit such changes. As the United States found no ground for objecting, others who had no interest in the premises at the time are not in a position to complain. *Washington & Idaho R. R. Co.* v. *Coeur d'Alene Ry. & Nav. Co.,* 160 U. S. 77, 97–98.

The railway company contends that its rights under the approved map relate back to the time when the map was first filed in the local land office rather than to the time of the refiling; and, in furtherance of the contention, the company asks that we take judicial notice of the files in the General Land Office, which it says will show that

the amendments made in the map between the filing and refiling were so unsubstantial that there was no real alteration. But we think the files in such a proceeding are not within the range of judicial notice and that if there was any purpose to rely on them in this connection they, or a certified copy of them, should have been produced in evidence at the trial. It cannot be merely assumed that the amendments were immaterial, and, in the absence of any proof of their nature and extent, the date of refiling, which was after they were made, must be taken as the time to which rights under the approved map relate.

We have seen that when the map was refiled, and when it was approved, the tract in question was included in Welo's preliminary homestead entry. The Supreme Court of the State thought this prevented any right in the tract from passing to the company under the approved map, and that the words, " subject to all valid existing rights," were inserted in the approval to show the tract was excluded. We reach a different conclusion.

The words quoted were not peculiar to this map, but were commonly inserted in the approvals of that period. Their office was not to show that any of the land designated on the map was excluded from the grant, but to direct attention to what under the act would be true without them,—namely, that the grant was to be effective as against the United States, but was not to impair valid existing claims of settlers or others, and that to make the grant effective against such claimants their rights should be extinguished through private negotiations or, if need be, through condemnation proceedings. See § 3 before quoted and § 2288, Rev. Stats.

That Welo had a valid existing right in virtue of his preliminary entry must be conceded. But it was only an inchoate right to acquire the title by residing on the land and otherwise complying with the homestead law for a

prescribed period. The title and real ownership were in the United States. Welo was under no obligation to perfect his claim. He could abandon it or relinquish it, but could not transfer it to another. Subject only to his claim the approved map vested in the company a complete right to the tract for station purposes. He voluntarily relinquished his entry and thus put an end to his claim. Nothing then stood in the way of the company's right. It was as if Welo's claim never had existed.

Unlike the land grants considered in cases like *Kansas Pacific Ry. Co. v. Dunmeyer,* 113 U. S. 629, 639, and *Hastings & Dakota R. R. Co. v. Whitney,* 132 U. S. 357, 361, the Act of 1875 contains no provision whereby lands covered by homestead or similar claims when the grant attaches are excluded from it. On the contrary, a survey of all that the act does contain shows that the grant is intended to include lands of that class, but with the qualification, plainly implied in the third section, that due compensation must be made to the claimants for their inchoate or possessory rights to make the grant operative against them. *Washington & Idaho R. R. Co. v. Osborn,* 160 U. S. 103, 109. An abandonment of the claims relieves the grant of the qualification. On this question the decisions have been very plain. It was before the Supreme Court of North Dakota in *Jamestown & Northern R. R. Co. v. Jones,* 7 N. Dak. 619, which related to a right of way over which the railroad was constructed in advance of the filing and approval of the map. The part in controversy was included in an existing preëmption claim when the road was constructed and also when the map was filed and approved. Afterwards the preëmption claim was abandoned. Thereupon another claimant, who had settled on the land after the construction of the road and before the filing or approval of the map, made an entry of the same tract and received a patent,—the entry papers and patent containing no exception of the right of

way. Two points were involved. One was whether the grant of the right of way attached as of the date when the road was constructed or as of the time when the map was filed or approved; and the other was whether the preëmption claim which was in existence at all of these times operated to except the land from the grant. The decision on the latter point is shown in the following excerpt from the opinion:

"When the act of 1875 is construed as a whole, we believe that, as against the United States, the right-of-way is transferred, even when the land has been entered at the time the map is approved, and that, if such entry is subsequently abandoned or set aside, the grantee will enjoy an absolute easement in the land. The rights of the railroad company will be subject to all rights which have attached to the land before the filing and approval of the map of definite location. But, as against the United States, the grant is as effective in cases where the land has been entered as where it has not. Under any other view of the statute, the railroad company might be compelled to condemn successive rights of settlers, only to find that all its proceedings were futile, because in each case the settler's rights were, by cancellation or abandonment, destroyed. We think that it was the purpose of congress to make the grant operative as against the government, subject only to existing rights of settlers, and that the question whether a particular piece of land was within the terms of the grant, so far as the government was concerned, was not to depend upon the freedom of that land from settlement at the time the map was approved. Under this view of the statute, a railroad company could never be required to condemn any other than existing rights."

Other courts in the public land States have decided the question in the same way. *Hamilton* v. *Spokane & Palouse R. R. Co.,* 3 Idaho, 164; *Bonner* v. *Rio Grande*

*Southern R. R. Co.,* 31 Colo. 446; *Alexander* v. *Kansas City, Ft. Scott & Memphis R. R. Co.,* 138 Mo. 464.

The case of *Jamestown & Northern R. R. Co.* v. *Jones* was brought here on writ of error and the railroad company's claim to the right of way was upheld,—the decision of the Supreme Court of North Dakota being disapproved as respects the time as of which the grant attached and sustained as respects the effect of the preëmption claim which was in existence at that time and afterwards abandoned. 177 U. S. 125. The opinion in the present case does not refer to that case, and we assume it was overlooked. Otherwise it doubtless would have been followed, as it should have been.

We come, then, to the ruling that the defendants purchased from Pollock in good faith relying on the certificate and patent issued to him, and so are entitled to prevail.

The claim on which Pollock received the certificate and patent was initiated more than two years after the new station grounds passed to the company under the approved map. True, the local land officers neglected to note that disposal on the township plat and tract book in their office; but this did not prejudice or affect the company's title. The noting was required by way of continuing a practice, which had long prevailed, of making the township plats and tract books in the land office of each district a fair and helpful index of all public land transactions in the district. Of course, a faithful adherence to the practice serves to prevent plural and conflicting disposals of the same lands, while a neglect of duty in that regard by the local officers sometimes, as here, results in confusing disposals. But the land department always has ruled that such a neglect of duty affords no justification for subordinating a senior to a junior claim or for making a second disposal in disregard of a prior one. *Edward R. Chase,* 1 L. D. 81; *Goist* v. *Bottum,* 5 L. D. 643; *Edward Young,*

9 L. D. 32; *Baird* v. *Chapman's Heirs,* 10 L. D. 210; *Linville* v. *Clearwaters,* 11 L. D. 356. In reason the point could not be ruled otherwise, for this would mean that a patent or its equivalent, although issued after full examination of the claim by the Commissioner of the General Land Office and the Secretary of the Interior, could be thwarted or made of no avail by a subsequent omission on the part of the local land officers,—notwithstanding this Court has adjudged that such a conveyance, when regularly issued and recorded in the General Land Office, passes the title and cannot be recalled or canceled by even the Secretary of the Interior. *United States* v. *Schurz,* 102 U. S. 378. The effect of such omissions often has been considered by this Court and always has been determined along the lines just indicated. It will suffice to refer to two of the cases. In *Van Wyck* v. *Knevals,* 106 U. S. 360, one party claimed under a land grant to a railroad company and the other under a patent issued on a cash entry. The grant was to attach when the route of the road was definitely fixed, and the Secretary of the Interior was then to withdraw from market all lands falling within the grant. A map definitely fixing the route was filed by the company with the Secretary and was accepted by him, but the intended withdrawal was not sent to the local land office for a half month or more. During that interval the cash entry was allowed and a patent certificate issued thereon. This Court sustained the claim under the grant as being first in time, and, in defining the rights which the company acquired through the filing and acceptance of the map, said, p. 367: " No further action is required of the company to establish the route. It then became the duty of the Secretary to withdraw the lands granted from market. But if he should neglect this duty, the neglect would not impair the rights of the company, however prejudicial it might prove to others." In *Stalker* v. *Oregon Short Line R. R. Co.,* 225 U. S. 142, the railroad

company was relying on a grant of station grounds under the Act of 1875, which the local land officers neglected to note on their records, and the other party was claiming under a patent issued on a preëmption claim. The Supreme Court of Idaho had sustained the claim of the railroad company because the map of the station grounds was filed in the local land office before the preëmption claim was initiated, 14 Idaho, 371, and that decision was affirmed by this Court on the following grounds, p. 153: " First, if we are right in holding that the grant vested in the company when the plat was approved, as of the date when filed, the failure of the officer in the district land office to properly mark the [township] plat could not operate to defeat the grant; and, secondly, the railroad company having done everything which it was required by law to do, should not be affected by the negligence of the register in not doing a duty upon which the vesting of title as against the United States did not depend." And also, p. 154: " We therefore conclude that the subsequent issue of a patent to the land entered by Reed [the preemptor] was subject to the rights of the railroad company theretofore acquired by approval of its station ground map. The patent is not an adjudication concluding the paramount right of the company, but insofar as it included lands validly acquired theretofore, was in violation of law, and inoperative to pass title."

When Pollock initiated his claim to the forty-acre subdivision, which includes the tract in question, the railroad was constructed and being operated across that subdivision, and this was true when the defendants purchased from him. Besides, the defendants understood, as did the community in general, that the company was not claiming under Pollock and that its rights, whatever they were, were older than his. These circumstances should have put the defendants on inquiry respecting the nature and extent of the company's claim and should have prompted

them to make the inquiry with particular regard to the
situation before Pollock's claim was initiated,—when the
subdivision was public land. So far as appears they made
no inquiry, but relied on the absence of any excepting
clause in Pollock's certificate and patent, neither of which
could bind the company or affect its prior rights. Among
other sources of information they could have interrogated
the company or its agent who was close at hand, but this
was not done. In short they neglected the warning which
inhered in the circumstances we have recited. The Act
of 1875 was a public statute applicable to public lands in
that region and some notice should have been taken of it.
We have seen that it made provision for acquiring a gen-
eral right of way of a uniform width and for securing
additional grounds for various station purposes,—such
grounds being in the nature of local extensions of the gen-
eral right of way. A complete record of the company's
proceedings under that act was kept in the usual way in
the General Land Office, and it is reasonably certain that
the defendants would have learned of those proceedings
had they heeded the promptings of the situation in which
they purchased. They therefore were chargeable with
notice of those proceedings. *Brush* v. *Ware,* 15 Pet. 93,
111.

The defendants interposed the defense of laches and
also a local statute of limitations, but the Supreme Court
of the State did not rule on either. Neither was appli-
cable to the case. The tract in question was not granted
for private use or disposal, but only for the *quasi* public
uses named in the act. In other words, the company
received the tract on the implied condition that it be de-
voted to those uses. A breach of the condition subjects
the grant to a forfeiture by the United States; but neither
laches on the part of the company nor any local statute
of limitations can invest individuals with any interest in
the tract, or with a right to use it for private purposes,

without the sanction of the United States. *Northern Pacific R. R. Co.* v. *Smith,* 171 U. S. 260, 275; *Northern Pacific Ry. Co.* v. *Townsend,* 190 U. S. 267; *Northern Pacific Ry. Co.* v. *Ely,* 197 U. S. 1; *Kindred* v. *Union Pacific R. R. Co.,* 225 U. S. 582, 597; *Stuart* v. *Union Pacific R. R. Co.,* 227 U. S. 342, 353.

It follows that the judgment should have been for the company instead of for the defendants.

*Judgment reversed.*