(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MARVIN M. BRANDT REVOCABLE TRUST ET AL. *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 12–1173.   Argued January 14, 2014—Decided March 10, 2014

Congress passed the General Railroad Right-of-Way Act of 1875 to provide railroad companies "right[s] of way through the public lands of the United States," 43 U. S. C. §934.  One such right of way, obtained by a railroad in 1908, crosses land that the United States conveyed to the Brandt family in a 1976 land patent.  That patent stated, as relevant here, that the land was granted subject to the railroad's rights in the 1875 Act right of way, but it did not specify what would occur if the railroad later relinquished those rights.  Years later, a successor railroad abandoned the right of way with federal approval.  The Government then sought a judicial declaration of abandonment and an order quieting title in the United States to the abandoned right of way, including the stretch that crossed the land conveyed in the Brandt patent.  Petitioners contested the claim, asserting that the right of way was a mere easement that was extinguished when the railroad abandoned it, so that Brandt now enjoys full title to his land without the burden of the easement.  The Government countered that the 1875 Act granted the railroad something more than a mere easement, and that the United States retained a reversionary interest in that land once the railroad abandoned it.  The District Court granted summary judgment to the Government and quieted title in the United States to the right of way.  The Tenth Circuit affirmed.

*Held*: The right of way was an easement that was terminated by the railroad's abandonment, leaving Brandt's land unburdened.  Pp. 8–17.

   (a) The Government loses this case in large part because it won when it argued the opposite in *Great Northern R. Co.* v. *United States*, 315 U. S. 262.  There, the Government contended that the

1875 Act (unlike pre-1871 statutes granting rights of way) granted nothing more than an easement, and that the railroad in that case therefore had no interest in the resources beneath the surface of its right of way. This Court adopted the Government's position in full. It found the 1875 Act's text "wholly inconsistent" with the grant of a fee interest, *id.*, at 271; agreed with the Government that cases describing the nature of rights of way granted prior to 1871 were "not controlling" because of a major shift in congressional policy concerning land grants to railroads after that year, *id.*, at 278; and held that the 1875 Act "clearly grants only an easement," *id.*, at 271. Under well-established common law property principles, an easement disappears when abandoned by its beneficiary, leaving the owner of the underlying land to resume a full and unencumbered interest in the land. See *Smith* v. *Townsend*, 148 U. S. 490, 499. Pp. 8–12.

(b) The Government asks this Court to limit *Great Northern*'s characterization of 1875 Act rights of way as easements to the question of who owns the oil and minerals beneath a right of way. But nothing in the 1875 Act's text supports that reading, and the Government's reliance on the similarity of the language in the 1875 Act and pre-1871 statutes directly contravenes the very premise of *Great Northern*: that the 1875 Act granted a fundamentally different interest than did its predecessor statutes. Nor do this Court's decisions in *Stalker* v. *Oregon Short Line R. Co.*, 225 U. S. 142, and *Great Northern R. Co.* v. *Steinke*, 261 U. S. 119, support the Government's position. The dispute in each of those cases was framed in terms of competing claims to acquire and develop a particular tract of land, and it does not appear that the Court considered—much less rejected—an argument that the railroad had only an easement in the contested land. But to the extent that those cases could be read to imply that the interest was something more, any such implication would not have survived this Court's unequivocal statement to the contrary in *Great Northern*. Finally, later enacted statutes, see 43 U. S. C. §§912, 940; 16 U. S. C. §1248(c), do not define or shed light on the nature of the interest Congress granted to railroads in their rights of way in 1875. They instead purport only to dispose of interests (if any) the United States already possesses. Pp. 12–17.

496 Fed. Appx. 822, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, GINSBURG, BREYER, ALITO, and KAGAN, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1173

_____

MARVIN M. BRANDT REVOCABLE TRUST, ET AL.
PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[March 10, 2014]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In the mid-19th century, Congress began granting private railroad companies rights of way over public lands to encourage the settlement and development of the West. Many of those same public lands were later conveyed by the Government to homesteaders and other settlers, with the lands continuing to be subject to the railroads' rights of way. The settlers and their successors remained, but many of the railroads did not. This case presents the question of what happens to a railroad's right of way granted under a particular statute—the General Railroad Right-of-Way Act of 1875—when the railroad abandons it: does it go to the Government, or to the private party who acquired the land underlying the right of way?

## I

### A

In the early to mid-19th century, America looked west. The period from the Louisiana Purchase in 1803 to the Gadsden Purchase in 1853 saw the acquisition of the western lands that filled out what is now the contiguous

United States.

The young country had numerous reasons to encourage settlement and development of this vast new expanse. What it needed was a fast and reliable way to transport people and property to those frontier lands. New technology provided the answer: the railroad. The Civil War spurred the effort to develop a transcontinental railroad, as the Federal Government saw the need to protect its citizens and secure its possessions in the West. *Leo Sheep Co.* v. *United States*, 440 U. S. 668, 674–676 (1979). The construction of such a railroad would "furnish a cheap and expeditious mode for the transportation of troops and supplies," help develop "the agricultural and mineral resources of this territory," and foster settlement. *United States* v. *Union Pacific R. Co.*, 91 U. S. 72, 80 (1875).

The substantial benefits a transcontinental railroad could bring were clear, but building it was no simple matter. The risks were great and the costs were staggering. Popular sentiment grew for the Government to play a role in supporting the massive project. Indeed, in 1860, President Lincoln's winning platform proclaimed: "That a railroad to the Pacific Ocean is imperatively demanded by the interests of the whole country; that the Federal Government ought to render immediate and efficient aid in its construction." J. Ely, Railroads and American Law 51 (2001). But how to do it? Sufficient funds were not at hand (especially with a Civil War to fight), and there were serious reservations about the legal authority for direct financing. "The policy of the country, to say nothing of the supposed want of constitutional power, stood in the way of the United States taking the work into its own hands." *Union Pacific R. Co., supra*, at 81.

What the country did have, however, was land—lots of it. It could give away vast swaths of public land—which at the time possessed little value without reliable transportation—in hopes that such grants would increase the appeal

of a transcontinental railroad to private investors. Ely, *supra*, at 52–53. In the early 1860s, Congress began granting to railroad companies rights of way through the public domain, accompanied by outright grants of land along those rights of way. P. Gates, History of Public Land Law Development 362–368 (1968). The land was conveyed in checkerboard blocks. For example, under the Union Pacific Act of 1862, odd-numbered lots of one square mile apiece were granted to the railroad, while even-numbered lots were retained by the United States. *Leo Sheep Co., supra*, at 672–673, 686, n. 23. Railroads could then either develop their lots or sell them, to finance construction of rail lines and encourage the settlement of future customers. Indeed, railroads became the largest secondary dispenser of public lands, after the States. Gates, *supra*, at 379.

But public resentment against such generous land grants to railroads began to grow in the late 1860s. Western settlers, initially some of the staunchest supporters of governmental railroad subsidization, complained that the railroads moved too slowly in placing their lands on the market and into the hands of farmers and settlers. Citizens and Members of Congress argued that the grants conflicted with the goal of the Homestead Act of 1862 to encourage individual citizens to settle and develop the frontier lands. By the 1870s, legislators across the political spectrum had embraced a policy of reserving public lands for settlers rather than granting them to railroads. *Id.,* at 380, 454–456.

A House resolution adopted in 1872 summed up the change in national policy, stating:

> "That in the judgment of this House the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice

to the whole people requires that the public lands should be held for the purpose of securing homesteads to actual settlers, and for educational purposes, as may be provided by law." Cong. Globe, 42d Cong., 2d Sess., 1585.

Congress enacted the last checkerboard land-grant statute for railroads in 1871. Gates, *supra,* at 380. Still wishing to encourage railroad construction, however, Congress passed at least 15 special acts between 1871 and 1875 granting to designated railroads "the right of way" through public lands, without any accompanying land subsidy. *Great Northern R. Co.* v. *United States*, 315 U. S. 262, 274, and n. 9 (1942).

Rather than continue to enact special legislation for each such right of way, Congress passed the General Railroad Right-of-Way Act of 1875, 18 Stat. 482, 43 U. S. C. §§934–939. The 1875 Act provided that "[t]he right of way through the public lands of the United States is granted to any railroad company" meeting certain requirements, "to the extent of one hundred feet on each side of the central line of said road." §934. A railroad company could obtain a right of way by the "actual construction of its road" or "in advance of construction by filing a map as provided in section four" of the Act. *Jamestown & Northern R. Co.* v. *Jones*, 177 U. S. 125, 130–131 (1900). Section 4 in turn provided that a company could "secure" its right of way by filing a proposed map of its rail corridor with a local Department of the Interior office within 12 months after survey or location of the road. §937. Upon approval by the Interior Department, the right of way would be noted on the land plats held at the local office, and from that day forward "all such lands over which such right of way shall pass shall be disposed of subject to the right of way." *Ibid.*

The 1875 Act remained in effect until 1976, when its

provisions governing the issuance of new rights of way were repealed by the Federal Land Policy and Management Act, §706(a), 90 Stat. 2793. This case requires us to define the nature of the interest granted by the 1875 Act, in order to determine what happens when a railroad abandons its right of way.

B

Melvin M. Brandt began working at a sawmill in Fox Park, Wyoming, in 1939. He later purchased the sawmill and, in 1946, moved his family to Fox Park. Melvin's son Marvin started working at the sawmill in 1958 and came to own and operate it in 1976 until it closed, 15 years later.

In 1976, the United States patented an 83-acre parcel of land in Fox Park, surrounded by the Medicine Bow-Routt National Forest, to Melvin and Lulu Brandt. (A land patent is an official document reflecting a grant by a sovereign that is made public, or "patent.") The patent conveyed to the Brandts fee simple title to the land "with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging, unto said claimants, their successors and assigns, forever." App. to Pet. for Cert. 76. But the patent did include limited exceptions and reservations. For example, the patent "except[s] and reserv[es] to the United States from the land granted a right-of-way thereon for ditches or canals constructed by the authority of the United States"; "reserv[es] to the United States . . . a right-of-way for the existing Platte Access Road No. 512"; and "reserv[es] to the United States . . . a right-of-way for the existing Dry Park Road No. 517." *Id.,* at 76–77 (capitalization omitted). But if those roads cease to be used by the United States or its assigns for a period of five years, the patent provides that "the easement traversed thereby shall terminate." *Id.,* at 78.

Most relevant to this case, the patent concludes by

stating that the land was granted "subject to those rights for railroad purposes as have been granted to the Laramie[,] Hahn's Peak & Pacific Railway Company, its successors or assigns." *Ibid.* (capitalization omitted). The patent did not specify what would occur if the railroad abandoned this right of way.

The right of way referred to in the patent was obtained by the Laramie, Hahn's Peak and Pacific Railroad (LHP&P) in 1908, pursuant to the 1875 Act.[1] The right of way is 66 miles long and 200 feet wide, and it meanders south from Laramie, Wyoming, through the Medicine Bow-Routt National Forest, to the Wyoming-Colorado border. Nearly a half-mile stretch of the right of way crosses Brandt's land in Fox Park, covering ten acres of that parcel.

In 1911, the LHP&P completed construction of its railway over the right of way, from Laramie to Coalmont, Colorado. Its proprietors had rosy expectations, proclaiming that it would become "one of the most important railroad systems in this country." Laramie, Hahns Peak and Pacific Railway System: The Direct Gateway to Southern Wyoming, Northern Colorado, and Eastern Utah 24 (1910). But the railroad ultimately fell short of that goal. Rather than shipping coal and other valuable ores as originally hoped, the LHP&P was used primarily to transport timber and cattle. R. King, Trails to Rails: A History of Wyoming's Railroads 90 (2003). Largely because of high operating costs during Wyoming winters, the LHP&P never quite achieved financial stability. It changed hands numerous times from 1914 until 1935, when it was acquired by the Union Pacific Railroad at the

---

[1] Locals at the time translated the acronym LHP&P as "Lord Help Push and Pull" or "Late, Hard Pressed, and Panicky." S. Thybony, R. Rosenberg, & E. Rosenberg, The Medicine Bows: Wyoming's Mountain Country 136 (1985).

urging of the Interstate Commerce Commission. *Ibid.*; S. Thybony, R. Rosenberg, & E. Rosenberg, The Medicine Bows: Wyoming's Mountain Country 136–138 (1985); F. Hollenback, The Laramie Plains Line 47–49 (1960).

In 1987, the Union Pacific sold the rail line, including the right of way, to the Wyoming and Colorado Railroad, which planned to use it as a tourist attraction. King, *supra,* at 90. That did not prove profitable either, and in 1996 the Wyoming and Colorado notified the Surface Transportation Board of its intent to abandon the right of way. The railroad tore up the tracks and ties and, after receiving Board approval, completed abandonment in 2004. In 2006 the United States initiated this action seeking a judicial declaration of abandonment and an order quieting title in the United States to the abandoned right of way. In addition to the railroad, the Government named as defendants the owners of 31 parcels of land crossed by the abandoned right of way.

The Government settled with or obtained a default judgment against all but one of those landowners—Marvin Brandt. He contested the Government's claim and filed a counterclaim on behalf of a family trust that now owns the Fox Park parcel, and himself as trustee.[2] Brandt asserted that the stretch of the right of way crossing his family's land was a mere easement that was extinguished upon abandonment by the railroad, so that, under common law property rules, he enjoyed full title to the land without the burden of the easement. The Government countered that it had all along retained a reversionary interest in the railroad right of way—that is, a future estate that would be restored to the United States if the railroad abandoned

———————————

[2] The other landowners had a potential interest in much smaller acreages: No other party could claim an interest in more than three acres of the right of way, and only six of the 31 potential claims amounted to more than one acre. See Amended Complaint in No. 06–CV–0184J etc. (D Wyo.), ¶¶6–10.

or forfeited its interest.

The District Court granted summary judgment to the Government and quieted title in the United States to the right of way over Brandt's land. 2008 WL 7185272 (D Wyo., Apr. 8, 2008).[3] The Court of Appeals affirmed. *United States* v. *Brandt*, 496 Fed. Appx. 822 (CA10 2012) (*per curiam*). The court acknowledged division among lower courts regarding the nature of the Government's interest (if any) in abandoned 1875 Act rights of way. But it concluded based on Circuit precedent that the United States had retained an "implied reversionary interest" in the right of way, which then vested in the United States when the right of way was relinquished. *Id.,* at 824.

We granted certiorari. 570 U. S. __ (2013).

## II

This dispute turns on the nature of the interest the United States conveyed to the LHP&P in 1908 pursuant to the 1875 Act. Brandt contends that the right of way granted under the 1875 Act was an easement, so that when the railroad abandoned it, the underlying land (Brandt's Fox Park parcel) simply became unburdened of the easement. The Government does not dispute that easements normally work this way, but maintains that the 1875 Act granted the railroads something more than an easement, reserving an implied reversionary interest in that something more to the United States. The Government loses that argument today, in large part because it won when it argued the opposite before this Court more than 70 years ago, in the case of *Great Northern Railway Co.* v. *United States*, 315 U. S. 262 (1942).

In 1907, Great Northern succeeded to an 1875 Act right

---

[3]The District Court dismissed without prejudice Brandt's separate counterclaim for just compensation. Brandt then filed a takings claim in the Court of Federal Claims. That case has been stayed pending the disposition of this one.

of way that ran through public lands in Glacier County, Montana. Oil was later discovered in the area, and Great Northern wanted to drill beneath its right of way. But the Government sued to enjoin the railroad from doing so, claiming that the railroad had only an easement, so that the United States retained all interests beneath the surface.

This Court had indeed previously held that the pre-1871 statutes, granting rights of way accompanied by checkerboard land subsidies, conveyed to the railroads "a limited fee, made on an implied condition of reverter." See, *e.g., Northern Pacific R. Co.* v. *Townsend*, 190 U. S. 267, 271 (1903). Great Northern relied on those cases to contend that it owned a "fee" interest in the right of way, which included the right to drill for minerals beneath the surface.

The Government disagreed. It argued that "the 1875 Act granted an easement and nothing more," and that the railroad accordingly could claim no interest in the resources beneath the surface. Brief for United States in *Great Northern R. Co.* v. *United States*, O. T. 1941, No. 149, p. 29. "The year 1871 marks the end of one era and the beginning of a new in American land-grant history," the Government contended; thus, cases construing the pre-1871 statutes were inapplicable in construing the 1875 Act, *id.,* at 15, 29–30. Instead, the Government argued, the text, background, and subsequent administrative and congressional construction of the 1875 Act all made clear that, unlike rights of way granted under pre-1871 land-grant statutes, those granted under the 1875 Act were mere easements.

The Court adopted the United States' position in full, holding that the 1875 Act "clearly grants only an easement, and not a fee." *Great Northern,* 315 U. S., at 271. The Court found Section 4 of the Act "especially persuasive," because it provided that "all such lands *over* which

such right of way shall pass shall be disposed of *subject to* such right of way." *Ibid.* Calling this language "wholly inconsistent" with the grant of a fee interest, the Court endorsed the lower court's statement that "[a]pter words to indicate the intent to convey an easement would be difficult to find." *Ibid.*

That interpretation was confirmed, the Court explained, by the historical background against which the 1875 Act was passed and by subsequent administrative and congressional interpretation. The Court accepted the Government's position that prior cases describing the nature of pre-1871 rights of way—including *Townsend*, *supra,* at 271—were "not controlling," because of the shift in congressional policy after that year. *Great Northern, supra,* at 277–278, and n. 18. The Court also specifically disavowed the characterization of an 1875 Act right of way in *Rio Grande Western R. Co.* v. *Stringham*, 239 U. S. 44 (1915), as "'a limited fee, made on an implied condition of reverter.'" *Great Northern, supra*, at 278–279 (quoting *Stringham*, *supra*, at 47). The Court noted that in *Stringham* "it does not appear that Congress' change of policy after 1871 was brought to the Court's attention," given that "[n]o brief was filed by the defendant or the United States" in that case. *Great Northern, supra*, at 279, and n. 20.

The dissent is wrong to conclude that *Great Northern* merely held that "the right of way did not confer one particular attribute of fee title." *Post,* at 3 (opinion of SOTOMAYOR, J.). To the contrary, the Court specifically rejected the notion that the right of way conferred even a "limited fee." 315 U. S., at 279; see also *id.,* at 277–278 (declining to follow cases describing a right of way as a "limited," "base," or "qualified" fee). Instead, the Court concluded, it was "clear from the language of the Act, its legislative history, its early administrative interpretation and the construction placed upon it by Congress in subse-

quent enactments" that the railroad had obtained "only an easement in its rights of way acquired under the Act of 1875." *Id.*, at 277; see *United States* v. *Union Pacific R. Co.*, 353 U. S. 112, 119 (1957) (noting the conclusion in *Great Northern* that, in the period after 1871, "only an easement for railroad purposes was granted"); 353 U. S*.,* at 128 (Frankfurter, J., dissenting) (observing that the Court "conclude[d] in the *Great Northern* case that a right of way granted by the 1875 Act was an easement and not a limited fee").

When the United States patented the Fox Park parcel to Brandt's parents in 1976, it conveyed fee simple title to that land, "subject to those rights for railroad purposes" that had been granted to the LHP&P. The United States did not reserve to itself any interest in the right of way in that patent. Under *Great Northern*, the railroad thus had an easement in its right of way over land owned by the Brandts.

The essential features of easements—including, most important here, what happens when they cease to be used—are well settled as a matter of property law. An easement is a "nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." Restatement (Third) of Property: Servitudes §1.2(1) (1998). "Unlike most possessory estates, easements . . . may be unilaterally terminated by abandonment, leaving the servient owner with a possessory estate unencumbered by the servitude." *Id.*, §1.2, Comment *d*; *id.,* §7.4, Comments *a*, *f*. In other words, if the beneficiary of the easement abandons it, the easement disappears, and the landowner resumes his full and unencumbered interest in the land. See *Smith* v. *Townsend*, 148 U. S. 490, 499 (1893) ("[W]hoever obtained title from the government to any . . . land through which ran this right of way would acquire a fee to the whole tract subject to the easement of

the company, and if ever the use of that right of way was abandoned by the railroad company the easement would cease, and the full title to that right of way would vest in the patentee of the land"); 16 Op. Atty. Gen. 250, 254 (1879) ("the purchasers or grantees of the United States took the fee of the lands patented to them subject to the easement created by the act of 1824; but on a discontinuance or abandonment of that right of way the entire and exclusive property, and right of enjoyment thereto, vested in the proprietors of the soil").[4]

Those basic common law principles resolve this case. When the Wyoming and Colorado Railroad abandoned the right of way in 2004, the easement referred to in the Brandt patent terminated. Brandt's land became unburdened of the easement, conferring on him the same full rights over the right of way as he enjoyed over the rest of the Fox Park parcel.

## III

Contrary to that straightforward conclusion, the Government now tells us that *Great Northern* did not really mean what it said. Emphasizing that *Great Northern* involved only the question of who owned the oil and min-

---

[4] Because granting an easement merely gives the grantee the right to enter and use the grantor's land for a certain purpose, but does not give the grantee any possessory interest in the land, it does not make sense under common law property principles to speak of the grantor of an easement having retained a "reversionary interest." A reversionary interest is "any future interest left in a transferor or his successor in interest." Restatement (First) of Property §154(1)(1936). It arises when the grantor "transfers less than his entire interest" in a piece of land, and it is either certain or possible that he will retake the transferred interest at a future date. *Id.*, Comment *a*. Because the grantor of an easement has not transferred his estate or possessory interest, he has not retained a reversionary interest. He retains all his ownership interest, subject to an easement. See *Preseault* v. *United States*, 100 F. 3d 1525, 1533–1534 (CA Fed. 1996) (en banc).

erals beneath a right of way, the Government asks the Court to limit its characterization of 1875 Act rights of way as "easements" to that context. Even if the right of way has some features of an easement—such as granting only a surface interest to the railroad when the Government wants the subsurface oil and minerals—the Government asks us to hold that the right of way is not an easement for purposes of what happens when the railroad stops using it. But nothing in the text of the 1875 Act supports such an improbable (and self-serving) reading.

The Government argues that the similarity in the language of the 1875 Act and the pre-1871 statutes shows that Congress intended to reserve a reversionary interest in the lands granted under the 1875 Act, just as it did in the pre-1871 statutes. See Brief for United States 17–18. But that is directly contrary to the very premise of this Court's decision (and the Government's argument) in *Great Northern*: that the 1875 Act granted a fundamentally different interest in the rights of way than did the predecessor statutes. 315 U. S., at 277–278; see U. S. *Great Northern* Brief 30 ("[Great Northern's] argument . . . fails because it disregards the essential differences between the 1875 Act and its predecessors."). Contrary to the Government's position now—but consistent with the Government's position in 1942—*Great Northern* stands for the proposition that the pre-1871 statutes (and this Court's decisions construing them) have little relevance to the question of what interest the 1875 Act conveyed to railroads.

The Government next contends that this Court's decisions in *Stalker* v. *Oregon Short Line R. Co.*, 225 U. S. 142 (1912), and *Great Northern R. Co.* v. *Steinke*, 261 U. S. 119 (1923), support its position that the United States retains an implied reversionary interest in 1875 Act rights of way. Brief for United States 28–32. According to the Government, both *Stalker* and *Steinke* demonstrate that those

rights of way cannot be bare common law easements, because those cases concluded that patents purporting to convey the land underlying a right of way were "inoperative to pass title." Brief for United States 31 (quoting *Steinke, supra,* at 131); see also Tr. of Oral Arg. 28–30, 33, 40–41, 44–45. If the right of way were a mere easement, the argument goes, the patent would have passed title to the underlying land subject to the railroad's right of way, rather than failing to pass title altogether. But that is a substantial overreading of those cases.

In both *Stalker* and *Steinke*, a railroad that had already obtained an 1875 Act right of way thereafter claimed adjacent land for station grounds under the Act, as it was permitted to do because of its right of way. A homesteader subsequently filed a claim to the same land, unaware of the station grounds. The question in each case was whether the railroad could build on the station grounds, notwithstanding a subsequent patent to the homesteader. The homesteader claimed priority because the railroad's station grounds map had not been recorded in the local land office at the time the homesteader filed his claim. This Court construed the 1875 Act to give the railroad priority because it had submitted its proposed map to the Department of the Interior before the homesteader filed his claim. See *Stalker, supra*, at 148–154; *Steinke, supra*, at 125–129.

The dispute in each case was framed in terms of competing claims to the right to acquire and develop the same tract of land. The Court ruled for the railroad, but did not purport to define the precise nature of the interest granted under the 1875 Act. Indeed, it does not appear that the Court in either case considered—much less rejected—an argument that the railroad had obtained only an easement in the contested land, so that the patent could still convey title to the homesteader. In any event, to the extent that *Stalker* and *Steinke* could be read to imply that the rail-

roads had been granted something more than an easement, any such implication would not have survived this Court's unequivocal statement in *Great Northern* that the 1875 Act "clearly grants only an easement, and not a fee." 315 U. S., at 271.

Finally, the Government relies on a number of later enacted statutes that it says demonstrate that Congress believed the United States had retained a reversionary interest in the 1875 Act rights of way. Brief for United States 34–42. But each of those statutes purported only to dispose of interests the United States already possessed, not to create or modify any such interests in the first place. First, in 1906 and 1909, Congress declared forfeited any right of way on which a railroad had not been constructed in the five years after the location of the road. 43 U. S. C. §940. The United States would "resume[ ] the full title to the lands covered thereby free and discharged of such easement," but the forfeited right of way would immediately "inure to the benefit of any owner or owners of land conveyed by the United States prior to such date." *Ibid.*

Then, in 1922, Congress provided that whenever a railroad forfeited or officially abandoned its right of way, "all right, title, interest, and estate of the United States in said lands" (other than land that had been converted to a public highway) would immediately be transferred to either the municipality in which it was located, or else to the person who owned the underlying land. 43 U. S. C. §912. Finally, as part of the National Trails System Improvements Act of 1988, Congress changed course and sought to retain title to abandoned or forfeited railroad rights of way, specifying that "any and all right, title, interest, and estate of the United States" in such rights of way "shall remain in the United States" upon abandonment or forfeiture. 16 U. S. C. §1248(c).

The Government argues that these statutes prove that

Congress intended to retain (or at least believed it had retained) a reversionary interest in 1875 Act rights of way. Otherwise, the argument goes, these later statutes providing for the disposition of the abandoned or forfeited strips of land would have been meaningless. That is wrong. This case turns on what kind of interest Congress granted to railroads in their rights of way in 1875. Cf. *Leo Sheep Co.*, 440 U. S., at 681 ("The pertinent inquiry in this case is the intent of Congress when it granted land to the Union Pacific in 1862."). *Great Northern* answered that question: an easement. The statutes the Government cites do not purport to define (or redefine) the nature of the interest conveyed under the 1875 Act. Nor do they shed light on what kind of property interest Congress intended to convey to railroads in 1875. See *United States* v. *Price*, 361 U. S. 304, 313 (1960) ("the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one").

In other words, these statutes do not tell us whether the United States has an interest in any particular right of way; they simply tell us how any interest the United States might have should be disposed of. For pre-1871 rights of way in which the United States retained an implied reversionary interest, or for rights of way crossing public lands, these statutes might make a difference in what happens to a forfeited or abandoned right of way. But if there is no "right, title, interest, [or] estate of the United States" in the right of way, 43 U. S. C. §912, then the statutes simply do not apply.

We cannot overlook the irony in the Government's argument based on Sections 912 and 940. Those provisions plainly evince Congress's intent to divest the United States of any title or interest it had retained to railroad rights of way, and to vest that interest in individuals to whom the underlying land had been patented—in other words, people just like the Brandts. It was not until

1988—12 years after the United States patented the Fox Park parcel to the Brandts—that Congress did an about-face and attempted to reserve the rights of way to the United States. That policy shift cannot operate to create an interest in land that the Government had already given away.[5]

\*    \*    \*

More than 70 years ago, the Government argued before this Court that a right of way granted under the 1875 Act was a simple easement. The Court was persuaded, and so ruled. Now the Government argues that such a right of way is tantamount to a limited fee with an implied reversionary interest. We decline to endorse such a stark change in position, especially given "the special need for certainty and predictability where land titles are concerned." *Leo Sheep Co.*, *supra*, at 687.

The judgment of the United States Court of Appeals for the Tenth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

―――――――

[5] The dissent invokes the principle that "any ambiguity in land grants 'is to be resolved favorably to a sovereign grantor,'" *post,* at 1 (quoting *Great Northern R. Co.* v. *United States*, 315 U. S. 262, 272 (1942)), but the Solicitor General does not—for a very good reason. The Government's argument here is that it gave away *more* in the land grant than an easement, so that more should revert to it now. A principle that ambiguous grants should be construed in favor of the sovereign hurts rather than helps that argument. The dissent's quotation is indeed from *Great Northern*, where the principle was cited in support of the Government's argument that its 1875 Act grant conveyed "only an easement, and not a fee." *Id.,* at 271.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1173

_____

## MARVIN M. BRANDT REVOCABLE TRUST, ET AL. PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[March 10, 2014]

JUSTICE SOTOMAYOR, dissenting.

The Court bases today's holding almost entirely on *Great Northern R. Co.* v. *United States*, 315 U. S. 262, 271 (1942), and its conclusion that the General Railroad Right-of-Way Act of 1875 granted "only an easement, and not a fee," to a railroad possessing a right of way. The Court errs, however, in two ways. First, it does not meaningfully grapple with prior cases—*Northern Pacific R. Co.* v. *Townsend*, 190 U. S. 267, 271 (1903), and *Rio Grande Western R. Co.* v. *Stringham*, 239 U. S. 44, 47 (1915)—that expressly concluded that the United States retained a reversionary interest in railroad rights of way. To the extent the Court regards *Great Northern* as having abrogated these precedents, it places on *Great Northern* more weight than that case will bear. Second, the Court relies on "basic common law principles," *ante,* at 12, without recognizing that courts have long treated railroad rights of way as *sui generis* property rights not governed by the ordinary common-law regime. Because *Townsend* and *Stringham* largely dictate the conclusion that the Government retained a reversionary interest when it granted the right of way at issue, and because any ambiguity in land grants "is to be resolved favorably to a sovereign grantor," *Great Northern*, 315 U. S., at 272, I respectfully dissent.

I

Over a century ago, this Court held that a right of way granted to a railroad by a pre-1871 Act of Congress included "an implied condition of reverter" to the Government if the right of way ceased to be used "for the purpose for which it was granted." *Northern Pacific R. Co.* v. *Townsend*, 190 U. S. 267, 271 (1903). The question in *Townsend* was whether individual homesteaders could acquire title by adverse possession to land granted by the United States as a railroad right of way. The Court held that they could not, because "the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company." *Ibid.* "On the contrary," the Court held, "the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof." *Ibid.* Hence the "implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." *Ibid.* In essence, the Court held, "the grant was of a limited fee," *ibid.*—commonly known as a defeasible fee, see Restatement (First) of Property §16 (1936)—rather than fee simple. Thus, if the railroad were to abandon its use of the right of way, the property would revert to the United States.

The Court later confirmed in *Rio Grande Western R. Co.* v. *Stringham*, 239 U. S. 44, 47 (1915), that this rule applies not just to pre-1871 land grants to railroads, but also to rights of way granted under the General Railroad Right-of-Way Act—the Act under which the United States granted the right of way at issue in this case. That case stated that rights of way granted under the 1875 Act are "made on an implied condition of reverter in the event that the company ceases to use or retain the land for the purposes for which it is granted." *Ibid.* Indeed, *Stringham*

sustained the validity of the reverter where, as here, the United States patented the adjacent land "subject to [the] right of way." *Id.*, at 46. If *Townsend* and *Stringham* remain good law on that point, then this case should be resolved in the Government's favor.

## II

## A

This case therefore turns on whether, as the majority asserts, *Great Northern* "disavowed" *Townsend* and *Stringham* as to the question whether the United States retained a reversionary interest in the right of way. *Ante,* at 10. *Great Northern* did no such thing. Nor could it have, for the Court did not have occasion to consider that question.

In *Great Northern*, a railroad sought to drill for oil beneath the surface of a right of way granted under the 1875 Act. We held that the railroad had no right to drill, because the United States did not convey the underlying oil and minerals when it granted the railroad a right of way. In language on which the Court relies heavily, *Great Northern* opined that the 1875 Act granted the railroad "only an easement, and not a fee." 315 U. S., at 271.

But that language does not logically lead to the place at which the majority ultimately arrives. All that *Great Northern* held—all, at least, that was necessary to its ruling—was that the right of way did not confer one particular attribute of fee title. Specifically, the Court held, the right of way did not confer the right to exploit subterranean resources, because the 1875 Act could not have made clearer that the right of way extended only to surface lands: It provided that after the recordation of a right of way, "all . . . lands *over* which such right of way shall pass shall be disposed of subject to such right of way." *Ibid.* (second emphasis and internal quotation marks omitted). But the Court did not hold that the right of way

failed to confer any sticks in the proverbial bundle of rights generally associated with fee title. Cf. B. Cardozo, The Paradoxes of Legal Science 129 (1928) (reprint 2000); *United States* v. *Craft*, 535 U. S. 274, 278 (2002). And this case concerns an attribute of fee title—defeasibility—that no party contends was at issue in *Great Northern*.

The majority places heavy emphasis on *Great Northern*'s characterization of rights of way under the 1875 Act as "easements," rather than "limited fees." When an easement is abandoned, the majority reasons, it is extinguished; in effect, it reverts to the owner of the underlying estate, rather than to its original grantor. *Ante,* at 11–12. For that reason, the majority concludes, "basic common law principles" require us to retreat from our prior holdings that railroad rights of way entail an implied possibility of reverter to the original grantor—the United States— should the right of way cease to be used by a railroad for its intended purpose. *Ante*, at 12.

But federal and state decisions in this area have not historically depended on "basic common law principles." To the contrary, this Court and others have long recognized that in the context of railroad rights of way, traditional property terms like "fee" and "easement" do not neatly track common-law definitions. In *Stringham*, the Court articulated ways in which rights of ways bear attributes both of easements and fees, explaining that "[t]he right of way granted by [the 1875 Act] and similar acts is neither a mere easement, nor a fee simple absolute." 239 U. S., at 47. In *New Mexico* v. *United States Trust Co.*, 172 U. S. 171, 182–183 (1898), the Court further observed that even if a particular right of way granted by the United States was an "easement," then it was "surely more than an ordinary easement" because it had "attributes of the fee" like exclusive use and possession. See also *Western Union Telegraph Co.* v. *Pennsylvania R. Co.*, 195 U. S. 540, 569–570 (1904) (reaffirming this view). Earlier, in

1854, the Massachusetts Supreme Judicial Court had explained that although the right acquired by a railroad was "technically an easement," it "require[d] for its enjoyment a use of the land permanent in its nature and practically exclusive." *Hazen* v. *Boston and Me. R. Co.*, 68 Mass. 574, 580 (1854). And the Iowa Supreme Court, in a late 19th-century opinion, observed that "[t]he easement" in question "is not that spoken of in the old law books, but is peculiar to the use of a railroad." *Smith* v. *Hall*, 103 Iowa 95, 96, 72 N. W. 427, 428 (1897).

Today's opinion dispenses with these teachings. Although the majority canvasses the special role railroads played in the development of our Nation, it concludes that we are bound by the common-law definitions that apply to more typical property. In doing so, it ignores the *sui generis* nature of railroad rights of way. That *Great Northern* referred to a right of way granted under the 1875 Act as an "easement" does not derail the Court's previous unequivocal pronouncements that rights of way under the Act are "made on an implied condition of reverter." *Stringham*, 239 U. S., at 47.

B

Not only does *Great Northern* fail to support the majority's conclusion; significant aspects of *Great Northern*'s reasoning actually support the contrary view. In that case, the Court relied heavily on Congress' policy shift in the early 1870's away from bestowing extravagant "'subsidies in public lands to railroads and other corporations.'" 315 U. S., at 273–274 (quoting Cong. Globe, 42d Cong., 2d Sess., 1585 (1872)). That history similarly weighs in the Government's favor here. Just as the post-1871 Congress did not likely mean to confer subsurface mineral rights on railroads, as held in *Great Northern*, it did not likely mean to grant railroads an indefeasible property interest in rights of way—a kind of interest more generous than that

which it gave in our cases concerning pre-1871 grants.

As in *Great Northern*, moreover, the purpose of the 1875 Act supports the Government. Congress passed the Act, we noted, "to permit the construction of railroads through public lands" and thus to "enhance their value and hasten their settlement." 315 U. S., at 272. In *Great Northern*, we held, that purpose did not require granting to the railroad any right to that which lay beneath the surface. The same is true here. As we recognized in *Townsend* and *Stringham*, the United States granted rights of way to railroads subject to "an implied condition of reverter in the event that the" railroads "cease[d] to use or retain the land for the purposes for which it is granted." *Stringham*, 239 U. S., at 47. Nothing about the purpose of the 1875 Act suggests Congress ever meant to abandon that sensible limitation.

Further, *Great Northern* relied on the conventional rule that "a grant is to be resolved favorably to a sovereign grantor," 315 U. S., at 272, and that "'nothing passes but what is conveyed in clear and explicit language,'" *ibid.* (quoting *Caldwell* v. *United States*, 250 U. S. 14, 20 (1919)). "Nothing in the [1875] Act," we observed, "may be characterized as a 'clear and explicit' conveyance of the . . . oil and minerals" underlying a right of way. 315 U. S., at 272. Just so here, as nothing in the 1875 Act clearly evinces Congress' intent not to make the rights of way conveyed under the Act defeasible, in the manner described by *Townsend* and *Stringham*. In fact, the presumption in favor of sovereign grantors applies doubly here, where the United States was the sovereign grantor both of the right of way and of the ultimate patent.

## III

The majority notes that in *Great Northern*, the United States took the position that rights of way granted to railroads are easements. *Ante,* at 9. In the majority's

view, because the *Great Northern* Court adopted that position "in full," it is unfair for the Government to back-track on that position now. *Ante,* at 9.

Even assuming that it is an injustice for the Government to change positions on an issue over a 70-year period, it is not clear that such a change in position happened here. Yes, the Government argued in *Great Northern* that a right of way was an "easement." It proposed, however, that the right of way may well have had "some of the attributes of a fee." Brief for United States in *Great Northern R. Co.* v. *United States*, O. T. 1941, No. 149, pp. 36–37. The Government contended that it is "'not important whether the interest or estate passed be considered an easement or a limited fee,'" observing that an easement "may be held in fee determinable." Id., at 35–36 (quoting *United States* v. *Big Horn Land & Cattle Co.*, 17 F. 2d 357, 365 (CA8 1927)). Indeed, the Government expressly reserved the possibility that it retained a reversionary interest in the right of way, even if the surrounding land was patented to others. Brief for United States in *Great Northern,* at 10 n. 4. The Court is right to criticize the Government when it takes "self-serving" and contradictory positions, *ante,* at 12, but such critique is misplaced here.

\*     \*     \*

Since 1903, this Court has held that rights of way were granted to railroads with an implied possibility of reverter to the United States. Regardless of whether these rights of way are labeled "easements" or "fees," nothing in *Great Northern* overruled that conclusion. By changing course today, the Court undermines the legality of thousands of miles of former rights of way that the public now enjoys as means of transportation and recreation. And lawsuits challenging the conversion of former rails to recreational trails alone may well cost American taxpayers hundreds of

millions of dollars.*  I do not believe the law requires this result, and I respectfully dissent.

_____

*Dept. of Justice, Environment and Natural Resources Div., FY 2014 Performance Budget, Congressional Submission, p. 7, http:// www.justice.gov/jmd/2014justification/pdf/enrd-justification.pdf (visited Mar. 7, 2014, and available in Clerk of Court's case file).