256 P.3d 321 (2011)
171 Wash.2d 486
Certification from the United States District Court for the Eastern District of Washington in Chad M. CARLSEN and Shasta Carlsen, husband and wife, individually and on behalf of a class of similarly situated Washington families; and Carl Popham and Mary Popham, husband and wife, individually and on behalf of a class of similarly situated Washington families, Plaintiffs,
v.
GLOBAL CLIENT SOLUTIONS, LLC, an Oklahoma limited liability company; Global Holdings, LLC, an Oklahoma limited liability company; Rocky Mountain Bank & Trust, a Colorado financial institution; Robert Merrick, a resident of Oklahoma; Michael Hendrix, a resident of Oklahoma; and John and Jane Does A-F, Defendants.
No. 84855-6.
Supreme Court of Washington.
Argued March 15, 2011.
Decided May 12, 2011.
*322 Darrell W. Scott, Matthew John Zuchetto, The Scott Law Group, PS, Spokane, WA, Timothy W. Durkop, Attorney at Law, Spokane Valley, WA, for Plaintiffs.
Sally Gustafson Garratt, Gregory Eugene Jackson, Freimund Jackson Tardif & Benedict Garratt, Olympia, WA, Richard W. Epstein, Haas A. Hatic, Rebecca F. Bratter, Greenspoon Marder, P.A., Fort Lauderdale, FL, for Defendants.
Robert Alan Lipson, Office of the Attorney General, Seattle, WA, amicus counsel for Attorney General of Washington.
Paul J. Lawrence, Jessica Anne Skelton, Pacifica Law Group LLP, Todd Lawrence Nunn, K & L Gates LLP, Seattle, WA, amicus counsel for NoteWorld, LLC.
FAIRHURST, J.
¶ 1 Washington residents who were consumers of allegedly illegal debt adjustment programs filed a class action against Global Client Solutions LLC (GCS) and Rocky Mountain Bank and Trust (RMBT), companies that respectively managed and held special purpose accounts, a key feature of the programs. The United States District Court for the Eastern District of Washington has certified to us four questions regarding Washington's debt adjusting statute, chapter 18.28 RCW.

I. FACTUAL HISTORY
¶ 2 Heavily indebted Washington consumers, including plaintiffs Chad M. and Shasta Carlsen and Carl and Mary Popham, sought debt relief from companies like Freedom Debt Relief LLC (Freedom). Freedom advertised *323 a debt relief program under which consumers would stop paying their unsecured creditors and instead authorize that monthly payments automatically be made into "special purpose accounts." Document (Doc.) 83, at 10[1] (Am. Class Action Compl. & Jury Demand). The consumers also authorized the automatic payment of large fees from the special purpose accounts to Freedom. When enough money accumulated in a consumer's special purpose account, Freedom would attempt to use the funds to negotiate settlements with creditors on terms favorable to the consumer.
¶ 3 The plaintiffs' special purpose accounts were held at RMBT and were structured as subaccounts of a large custodial account in GCS's name. The custodial account allowed debt settlement companies like Freedom to view the balance and transaction history in each of their customers' accounts. The plaintiffs could access their special purpose accounts on line and terminate them at any time by sending written notice. But on a practical level, the plaintiffs did not need to access their accounts because they had signed blanket authorizations upon entering the debt relief program that established automatic (1) monthly transfers from the plaintiffs' primary bank accounts to their special purpose accounts, (2) monthly payments from the special purpose accounts to the debt settlement company, (3) monthly and onetime payments from the special purpose accounts to GCS for banking services, and (4) disbursements from the special purpose accounts to creditors when the debt settlement company negotiated a settlement. In its role as "processor" for the special purpose accounts, GCS initiated all these automatic transfers. Doc. 70-7 (Decl. of Richard P. Epstein, Welcome to Global Client Solutions letter).
¶ 4 GCS charged consumers various fees for its processing services. For example, plaintiffs Carl and Mary Popham agreed to pay a one-time account setup fee of $9.00, a monthly service charge of $9.85, and various fees per service, such as $15.00 per wire transfer. The plaintiffs authorized these fees by signing a special purpose account application when they signed up for the debt relief program.
¶ 5 According to the plaintiffs, GCS's custodial account at RMBT contained over 600,000 special purpose accounts. To obtain these accounts, GCS contracted with over 500 different debt settlement companies like Freedom. Although GCS had contracts with these debt settlement companies, it generally did not receive fees from them. Rather, GCS's earnings came from the fees charged directly to special purpose account holders like the plaintiffs. RMBT did not receive fees from GCS or the plaintiffs, but it benefited by holding the plaintiffs' money without paying interest.
¶ 6 In 2009, the Federal Deposit Insurance Corporation (FDIC) issued a cease and desist order requiring drastic reformation of RMBT's banking practices. The order included a requirement that RMBT "provide adequate and effective oversight over the Bank's third-party relationships, specifically focusing on monitoring the activities of third-party payment processors and their customers, who are referred to herein as Debt Settlement Companies." Doc. 58-13, at 378 (Decl. of Darrell W. Scott, Order to Cease and Desist). GCS subsequently stopped opening new accounts at RMBT and transferred the majority of its existing special purpose accounts to a new custodial account in its name at an Oklahoma bank.

II. PROCEDURAL HISTORY
¶ 7 In 2009, the Carlsens and the Pophams filed in the United States District Court for the Eastern District of Washington a class action complaint against GCS and RMBT on behalf of all Washington consumers who had special purpose accounts with GCS. GCS and RMBT each moved to dismiss under Fed.R.Civ.P. 12(b)(6). The court stayed the Fed.R.Civ.P. 12(b)(6) motions pending certification to this court of questions of first impression regarding Washington's debt adjusting statute, "for which legislative history and relevant case law are essentially non-existent." Certification to Washington State Supreme Court (Certification) at 2-3. To assist *324 it in formulating the certified questions, the court ordered limited discovery on "the precise nature of GCS and RMBT, and what they do in conjunction with each other, and in conjunction with debt settlement companies." Doc. 40, at 8 (Order Den. Mots. to Compel Arbitration, inter alia).
¶ 8 The plaintiffs brought a separate class action suit against Freedom and similar debt settlement companies, and the United States District Court for the Eastern District of Washington certified to us three questions regarding that case. Carlsen v. Freedom Debt Relief LLC, No. 84858-1. That case has been stayed because the parties reached a settlement.

III. ANALYSIS
¶ 9 Certified questions from federal court are questions of law that we review de novo. Bradburn v. N. Cent. Reg'l Library Dist., 168 Wash.2d 789, 799, 231 P.3d 166 (2010). We consider the legal issues not in the abstract but based on the certified record provided by the federal court. Id. (citing RCW 2.60.030(2)).
QUESTION NO. 1: Is a for-profit business engaged in "debt adjusting" as defined in RCW 18.28.010(1) when, in collaboration with debt settlement companies, it: a) establishes and maintains a custodial bank account in its name; b) solicits debtors' establishment of a sub-account to receive and hold periodic payments to be used to pay debt settlement fees and pay settlements with creditors as negotiated by a debt settlement company; and c) as custodian for the debtor, receives and holds the debtor's periodic payments in a sub-account, paying from that account debt settlement fees and negotiated settlements with creditors?
Certification at 3. This question describes actions taken by GCS, not by RMBT, in conjunction with debt settlement companies.
¶ 10 In interpreting a statute, we look first to the statute's plain meaning. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 11-12, 43 P.3d 4 (2002). RCW 18.28.010(1) defines "`[d]ebt adjusting'" as "the managing, counseling, settling, adjusting, prorating, or liquidating of the indebtedness of a debtor, or receiving funds for the purpose of distributing said funds among creditors in payment or partial payment of obligations of a debtor." (Emphasis added.) Here, GCS is engaged in "debt adjusting" under the plain language of this definition's last prong because GCS receives funds into a custodial account in its own name and, after a company like Freedom negotiates a settlement, GCS distributes money to the creditor in payment or partial payment of the consumer's debt.
¶ 11 GCS argues it is not truly "receiving" the funds because the plaintiffs had full control over their special purpose accounts and authorized every transaction. "[R]eceive" means "to take possession or delivery of" or "to knowingly accept." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1894 (2002). The fact that plaintiffs had management powers does not change the fact that GCS took possession and delivery of the funds by accepting them into a custodial account established and maintained in its own name. The custodial account structure allowed GCS and debt settlement companies to view the balances and transaction histories of the special purpose accounts. Thus, in practice, as well as based on title alone, GCS "received" the plaintiffs' money.
¶ 12 GCS also argues it is not a debt adjuster because a 1978 legislative audit of the debt adjusting statute described debt adjusters' basic model of operation as involving direct contact with debtors and creditors, which GCS does not have. GCS & RMBT's Answering Br. at 22-23 (quoting Performance Audit: Debt Adjusting, Licensing and Regulatory Activities, Report No. 77-13, Jan. 20, 1978, at 7 (on file with Wash. State Archives, H.B. 86 (1979)) (hereinafter 1978 Performance Audit)). Because the definition of "debt adjusting" is unambiguous, we need not consider legislative history. Campbell & Gwinn, 146 Wash.2d at 12, 43 P.3d 4. Even if we did, GCS's interpretation of that history is strained. Read as a whole, the 1978 Performance Audit reveals a deep-seated concern about the abuses inherent in the debt adjusting industry. E.g., 1978 Performance Audit at 7 ("The lack of industry regulation, *325 and the frequently unsophisticated and/or desperate client seeking relief from bill collectors' harassment, gave rise to numerous unfair and deceptive practices."). It is unreasonable to suggest that the legislature intended to allow companies whose activities fit the broad statutory definition of "debt adjusting" to nonetheless escape regulation by splitting the traditional functions of a debt adjuster between multiple entities.[2]
QUESTION NO. 2: Does the exclusion found at RCW 18.28.010(2)(b) apply to a for-profit business described in Question No. 1?
Certification at 3.
¶ 13 A "`[d]ebt adjuster'" includes "any person engaging in or holding himself or herself out as engaging in the business of debt adjusting for compensation." RCW 18.28.010(2). Certain persons are excluded from this definition, including,
[a]ny person, partnership, association, or corporation doing business under and as permitted by any law of this state or of the United States relating to banks, consumer finance businesses, consumer loan companies, trust companies, mutual savings banks, savings and loan associations, building and loan associations, credit unions, crop credit associations, development credit corporations, industrial development corporations, title insurance companies, or insurance companies.
RCW 18.28.010(2)(b).
¶ 14 GCS argues this exemption applies to it because it is (1) an agent of RMBT, a bank, and (2) subject to FDIC oversight and the operating rules of the National Automatic Clearinghouse Association (NACHA). Similarly, amicus NoteWorld LLC[3] argues the words "relating to" mean the statute applies broadly to any entity whose business relates to the listed entities. Br. of Amicus Curiae NoteWorld LLC at 19. For example, Note-World contends money transmitters (a type of entity subject to regulation under chapter 19.230 RCW) are exempt from the debt adjusting statute under RCW 18.28.010(2)(b) because they are subject to federal regulation under the Bank Secrecy Act, 31 U.S.C. § 5312(a)(2)(R).
¶ 15 To ascertain a statute's plain meaning, we look not only to the particular statute at issue, but also to what the legislature has said in related statutes. Campbell & Gwinn, 146 Wash.2d at 11-12, 43 P.3d 4. Here, nearly all of the 13 entities listed in RCW 18.28.010(2)(b) correspond to the name of a title or chapter in the Revised Code of Washington containing a regulatory law.[4] These related statutes show that the *326 legislature intended to exempt entities whose primary operations were already subject to defined regulatory schemes. The phrase "doing business under and as permitted by" further emphasizes that the exempt entities' primary business activities and operations must be fully governed by regulatory law. Therefore, only the 13 entities actually listed, which are fully regulated under other Washington statutes, are exempt under RCW 18.28.010(2)(b). Application of a single law relating to one of the listed entities, like the Bank Secrecy Act, is not enough to qualify for the exemption.
¶ 16 Washington case law supports this interpretation. In Kelleher v. Minshull, 11 Wash.2d 380, 389, 119 P.2d 302 (1941), we described a similar exemption in Washington's small loan act as "exempt[ing] from the operation of the act eight classes of persons." This description shows we interpreted the exemption as applying to the specific entities listed, not to a broader group of unnamed but related entities. We went on to say that the exemption existed because "the legislature undoubtedly concluded that the persons exempted from the operation of the [small loan act] were sufficiently regulated and controlled by the terms of specific statutes previously enacted to regulate such persons and the businesses in which they are engaged." Id. at 390, 119 P.2d 302. Under the same reasoning, only entities sufficiently regulated and controlled under other laws should benefit from the exemption in Washington's debt adjusting statute.
¶ 17 Moreover, as a remedial statute enacted to stem the "numerous unfair and deceptive practices" rife in the growing debt adjustment industry, the debt adjusting statute should be construed liberally in favor of the consumers it aims to protect. 1978 Performance Audit at 7; see State v. Pike, 118 Wash.2d 585, 591, 826 P.2d 152 (1992). A narrow interpretation of RCW 18.28.010(2)(b) protects consumers by preventing companies from escaping the debt adjusting statute by identifying a single law applicable to them that is also applicable to one of the 13 listed entities, however tangential or limited the impact of that law may be. Such a gaping loophole would directly contravene the debt adjusting statute's remedial purpose.
¶ 18 On the record before us, it appears the exemption in RCW 18.28.010(2)(b) does not apply to GCS. GCS is not a bank. It does not matter if GCS is a bank's agent or if it is subject to limited FDIC authority or the rules of a private organization like NACHA. Unless GCS is one of the 13 entities listed, it is subject to the debt adjusting statute.
QUESTION NO. 3: Do the fee limitations set forth in RCW 18.28.080 apply to for-profit debt settlement companies engaged in soliciting the participation of debtors in a debt management program involving: a) monthly set aside and accumulation of a debtor's funds in a custodial account for the purposes of facilitating negotiated settlement of specified credit card debts; and b) negotiations by the debt settlement company, on behalf of the debtor, to secure compromise settlement of the debtor's credit card debt, to be paid from the custodial account?
Certification at 3. This question essentially asks whether the debt settlement companies that work with GCS and RMBT, such as Freedom, are subject to the debt adjusting statute's fee limitations.
¶ 19 The debt adjusting statute's fee limit provision states in part,
The total fee for debt adjusting services may not exceed fifteen percent of the total debt listed by the debtor on the contract. The fee retained by the debt adjuster from any one payment made by or on behalf of the debtor may not exceed fifteen percent of the payment.
RCW 18.28.080(1) (emphasis added). This language indicates that fee limits apply when the entity in question is a debt adjuster or providing debt adjusting services. As noted, "`[d]ebt adjusting'" is defined as "the managing, counseling, settling, adjusting, prorating, or liquidating of the indebtedness of a debtor, or receiving funds for the purpose of *327 distributing said funds among creditors in payment or partial payment of obligations of a debtor." RCW 18.28.010(1). A "`[d]ebt adjuster'" includes "any person engaging in or holding himself or herself out as engaging in the business of debt adjusting for compensation." RCW 18.28.010(2).
¶ 20 Here, the debt settlement companies described in certified question three appear to be providing debt adjusting services because they manage and, if successful, eventually settle consumer debt. The fact that the legislature may not have contemplated the precise business model used by these debt settlement companies does not prevent their activities from being classified as "`[d]ebt adjusting'" if the activities fit within the plain language of RCW 18.28.010(1). If the debt settlement companies are "`[d]ebt adjusting,'" then they are also "`[d]ebt adjusters'" because they are "engaging in ... the business of debt adjusting for compensation." RCW 18.28.010(1), (2). Whether Freedom and similar debt settlement companies are actually debt adjusters who are debt adjusting, however, is ultimately a factual question the district court must resolve based on the exact nature of the debt settlement companies and the services they provide.
QUESTION NO. 4: Does the [d]ebt [a]djusting statute provide for an implied civil action against an alleged "aider and abettor" where aiding or abetting a violation of the [d]ebt [a]djusting statute is expressly made a crime pursuant to RCW 18.28.190?
Certification at 3-4.
¶ 21 RCW 18.28.190 makes it a gross misdemeanor to aid and abet violation of the debt adjusting statute. By criminalizing aiding and abetting, the debt adjusting statute establishes that aiding and abetting its violation is wrongful conduct. RCW 18.28.185 provides an express civil remedy for violation of the debt adjusting statute: "a violation of this chapter constitutes an unfair or deceptive act or practice in the conduct of trade or commerce under [the Consumer Protection Act (CPA),] chapter 19.86 RCW." Because the debt adjusting statute explicitly makes it a wrongful, criminal act to aid and abet violations of the statute's primary requirements for debt adjusters, such as fee limits and disclosure rules, "a violation of this chapter," as used in RCW 18.28.185, includes such aiding and abetting violations. The plaintiffs need not establish an implied civil cause of action to recover for aiding and abetting violations, as RCW 18.28.185 provides them a direct civil remedy for this conduct under the CPA.[5]

IV. CONCLUSION
¶ 22 GCS is a debt adjuster, and GCS is not exempt under RCW 18.28.010(2)(b) because GCS is not a bank or another listed entity. Debt settlement companies that work with GCS and RMBT are likely subject to the debt adjusting statute's fee limitations, depending on whether they are debt adjusters providing debt adjusting services. Because RCW 18.28.185 makes aiding and abetting violation of the debt adjusting statute an unfair or deceptive act or practice in the conduct of trade or commerce under the CPA, we need not consider whether an implied cause of action for such conduct also exists.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, JAMES M. JOHNSON, DEBRA L. STEPHENS, and CHARLES K. WIGGINS, Justices.
CHAMBERS, J. (concurring).
¶ 23 I fully concur with Justice Fairhurst's measured, well reasoned majority opinion. I write separately, however, to stress that the same evils our legislature sought to avoid in *328 decades past by regulating the debt adjustment industry still lurk.
¶ 24 As our legislature knew long ago, debt adjusting "is noted for its historic abuse and questionable practice and is outlawed or regulated in most States." WASH. LEGIS. BUDGET COMM., PERFORMANCE AUDIT: DEBT ADJUSTING, LICENSING AND REGULATORY ACTIVITIES, Report No. 77-13, at 3 (Jan. 20, 1978) (on file with Wash. State Archives, H.B. 86, 46th Leg., Reg. Sess. (Wash. 1979)). Abuse of debtors has been so troubling historically that when the original 1967 legislation was set to sunset, then Attorney General Slade Gorton's consumer protection and antitrust division counseled the legislature that
[i]t is our considered opinion that debt adjusting for profit in this state should not be regulated but rather should be prohibited. While it is highly unusual for this office to recommend such a step in view of our strong support for competition and free enterprise with a minimum of regulation, our experience in this area indicates that this field, even with regulation, is open to abuse.
WASH. LEGIS. BUDGET COMM., SUNSET AUDIT PROGRAM AND FISCAL REVIEW OF DEBT ADJUSTING, LICENSING AND REGULATORY ACTIVITIES app. 1 (Preliminary Report Sept. 17, 1977) (on file with Wash. State Archives, Substitute H.B. 564, 45th Leg., 1 st Ex. Sess. (Wash. 1977)). The same sunset audit noted that "[a]n estimated 50 percent of clients signing up for a program never complete it." Id. at 18.
¶ 25 Time has seemed to only make these numbers worse. According to the debt settlement industry's own statistics, the dropout rate is almost 66 percent. Of that 66 percent, 65 percent leave the programs with no settlements. Telemarketing Sales Rule, 75 Fed.Reg. 48,458, 48,472-73 (Aug. 10, 2010). As the Federal Trade Commission (FTC) recently observed:
[D]ebt settlement is a high-risk financial product that requires consumers simultaneously to pay significant fees, save hundreds or thousands of dollars for potential settlements, and meet other obligations such as mortgage payments. Failure leads to grave consequencesincreased debt, impaired credit ratings, and lawsuits that result in judgments and wage garnishments.
Id. at 48,484. "Consumers drop out of debt relief programs for many reasons, but the record shows that providers' practice of charging substantial advance fees is a significant cause." Id. at 48,485. Because of this, and because of the "deceptive and abusive practices of debt relief service providers," the FTC has banned advanced fees for debt settlement companies, reducing the incentive and opportunity for debtor abuse. Id. at 48,465; 16 C.F.R. § 310.4. Those who enter a debt adjustment program but eventually drop out are generally much worse off than if they had not participated in the program at all. Not only have they paid substantial fees to a debt adjuster, but their debt problems continue to grow and spiral out of control.
¶ 26 This case illustrates the creativity of businesses attempting to circumvent regulation. As cats are drawn to cream, many forprofit debt adjusters will be attracted to the most unsophisticated of consumers. Despite the recent federal rule, I fear that until the Washington legislature prohibits debt adjusting for profit, consumers in Washington will continue to suffer. In my view, the chronic and systemic abuses in the Washington debt adjusting industry deserve the attention of the Washington State Legislature.
¶ 27 With these observations, I concur.
NOTES
[1] The document numbers listed correspond to the United States District Court's docket number.
[2] GCS and amicus NoteWorld LLC also argue that GCS is not engaging in debt adjusting because new Federal Trade Commission (FTC) rules implementing the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101-6108) distinguish between debt relief services and account administrators. 16 C.F.R. § 310. Given that the plain language of the debt adjusting statute is unambiguous and that the statute's legislative history reinforces the plain language interpretation, we need not look beyond Washington law in our interpretation. We also decline to address the possibility of preemption, as it is beyond the scope of the district court's certified question.
[3] NoteWorld LLC is GCS's primary competitor in the industry. See Doc. 57-14, at 41 (Dep. of Michael Hendrix). NoteWorld is also the defendant in a similar class action brought by the plaintiffs' attorneys.
[4] (1) Banks: Title 30 RCW, banks and trust companies. (2) Consumer finance businesses: For many years, RCW 31.08.010-.920 was called the Consumer Finance Act, repealed by Laws of 1991, ch. 208, § 24. That act was replaced by the Consumer Loan Act, chapter 31.04 RCW. See Laws of 1991, ch. 208. (3) Consumer loan companies: Chapter 31.04 RCW, Consumer Loan Act. (4) Trust companies: Title 30 RCW, banks and trust companies. (5) Mutual savings banks: Title 32 RCW, mutual savings banks. (6) Savings and loan associations: Title 33 RCW, savings and loan associations. (7) Building and loan associations: This term appears to be used as a synonym for savings and loan associations. Cf. RCW 31.04.025(1)(a) (exempting from the Consumer Loan Act "[a]ny person doing business under, and as permitted by, any law of this state or of the United States relating to banks, savings banks, trust companies, savings and loan or building and loan associations, or credit unions" (emphasis added)); Black's Law Dictionary 222 (9th ed. 2009) (listing "savings-and-loan association" as a related but contrasting entity to "building-and-loan association"). (8) Credit unions: Chapter 31.12 RCW, Washington State Credit Union Act. (9) Crop credit associations: Chapter 31.16 RCW, crop credit associations, repealed by Laws of 1999, ch. 137, § 1. (10) Development credit corporations: Chapter 31.20 RCW, development credit associations. (11) Industrial development corporations: Chapter 31.24 RCW, industrial development corporations. (12) Title insurance companies: Chapter 48.29 RCW, title insurers. (13) Insurance companies: Title 48 RCW, insurance.
[5] We note that an aider and abettor may be criminally and civilly liable under the debt adjusting statute even if exempt under RCW 18.28.010(2) from the statute's primary requirements for "`[d]ebt adjusters,'" such as fee limits and disclosure rules. For example, while RMBT is likely exempt from the debt adjusting statute's primary requirements under RCW 18.28.010(2)(b) because it is a bank, RMBT still commits a crime and an unfair or deceptive act or practice in the conduct of trade or commerce if it aids and abets a debt adjuster in violating those requirements.