FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 25, 2024

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 25, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON )<br><br>KING COUNTY, )<br><br>Plaintiff, )<br><br>v. )<br><br>MICHAEL J. ABERNATHY; GINA M. ABERNATHY; SCOTT C. BAISCH; JENNIFER C. BAISCH; WARREN BERES; VICKI BERES; JODY J. BREWSTER; ANDREW J. FARACI; ALLISA E. FARACI; PATRICIA J. HARRELL; 2263 E LAKE SAMMAMISH PL SAMMAMISH LLC†; MICHAEL PARROTT; AND DIANA PARROTT )<br><br>Defendants. ) | No. 101075-3<br><br>EN BANC<br><br>Filed: <u>January 25, 2024</u> |

---

† Defendants filed a motion to substitute named defendants under RAP 3.2(b) after transferring ownership, requesting we substitute 2263 E Lake Sammamish Pl Sammamish LLC for Andrzej Milkowski and Lisa M. Milkowski as the named defendants. We granted the motion.

MONTOYA-LEWIS, J.— Ownership over shorelands is an essential aspect of state sovereignty. As with water rights in the state of Washington, shoreland ownership has been subject to much litigation and legislation since statehood. When Washington became a state in 1889, it specifically addressed its special interest in shoreland. *See* WASH. CONST. art. XVII. Article XVII of the Washington State Constitution asserts state ownership over the beds and shorelands of the state's navigable waters except those "patented by the United States." WASH. CONST. art. XVII, §§ 1, 2.

However, in 1887, two years prior to statehood, the federal government granted a railroad company a "right-of-way" to build a railroad over a 3.6 mile section of land along the shore of Lake Sammamish. Since then, individual property owners, the state, and the county have utilized the shorelands in a variety of manners. The ultimate ownership and permitted usages have not been resolved, leaving this case to address them via a certified question from the federal district court.

Specifically, the United States District Court for the Western District of Washington asks us whether a right-of-way approved by the United States Department of the Interior under the General Railroad Right-of-Way Act of 1875, 43 U.S.C. §§ 934-939, is a conveyance "patented by the United States" under art. XVII, § 2 of the Washington State Constitution. Simply stated, we are asked to determine whether the land was "patented" by the federal government under art.

XVII, § 2 of our state constitution. If the shoreland *was* patented, it never belonged to the State of Washington; rather, it was owned by the railroad and later King County. If the shoreland was *not* patented, Washington owned it at statehood and later conveyed it to private parties, and the shoreland belongs to the present-day homeowners (the Abernathys).

We answer the certified question no and hold for the Abernathys. The right-of-way was an easement that did not constitute a land conveyance patented by the United States. Thus, the land belonged to Washington at the time of statehood and is presently owned by the homeowners.

## I. FACTS AND PROCEDURAL HISTORY

### A.     Factual Background

This lawsuit concerns a 3.6 mile section of land (Corridor) along the eastern side of Lake Sammamish, the western edge of which runs over a shoreland. In 1887, the federal government granted the Seattle, Lake Shore and Eastern Railway Company (SLS&E) a "right-of-way" to build a railroad over the Corridor, and the United States Department of the Interior approved the map for the proposed railway. SLS&E built the railroad under the General Railroad Right-of-Way Act of 1875 (the 1875 Right-of-Way Act), 43 U.S.C. §§ 934-939, which provided a mechanism for railroad companies to obtain rights-of-way over land to build railroads to encourage development. SLS&E's successor in interest, Burlington Northern Santa Fe Railway

Company, deeded its rights in the Corridor to the Land Conservancy of Seattle and King County. The parties do not dispute that the 1875 Right-of-Way Act granted only an easement[1] over the Corridor.

In 1998, a federal agency "railbanked" the then out-of-service Corridor under the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247, meaning the Corridor was authorized to be used as an interim trail until a railroad might need it for rail service. Shortly thereafter, the Land Conservancy of Seattle and King County deeded its rights in the Corridor to Plaintiff King County. Since then, King County has constructed an interim public trail along the Corridor and is in the process of constructing a permanent, paved trail.

B.    Procedural History

The defendants (Abernathys) own property along this 3.6 mile section of land and have built or maintained docks, boat lifts, decks, fences, and other structures in the Corridor and adjacent shorelands.[2] In 2020, King County sued in federal court for quiet title, ejectment, and trespass. King County contended that the Abernathys' structures were encroaching on the Corridor and trespassing on public lands.

The parties filed cross motions for summary judgment regarding ownership

---

[1] "An easement is a 'nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.'" *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 105, 134 S. Ct. 1257, 188 L. Ed. 2d 272 (2014) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.2(1) (1998)).

[2] Some of the defendants stated King County issued them permits to build their docks. *E.g.*, Doc. 79 (decl. of Vicki Beres) at 4.

and control of the Corridor. In 2021, a magistrate judge drafted a report and recommendation, recommending the District Court hold that the strip of shoreland within the Corridor had been "patented"[3] by the federal government prior to Washington becoming a state and, therefore, that Washington had disclaimed its interest in that shoreland under art. XVII, § 2 of the Washington State Constitution. The report and recommendation further recommended the court hold that since Washington had disclaimed its interest in that shoreland, it never had authority to sell the land to the Abernathys' common predecessor in interest, thereby making King County the true owner. In other words, the magistrate judge recommended that the court hold that the right-of-way was patented by the United States and that the shoreland therefore belonged to King County.

In 2022, Judge Estudillo of the United States District Court for the Western District of Washington requested briefing limited to whether the court should certify the question of whether the right-of-way, granted under the 1875 Right-of-Way Act, granted a "patented" right under art. XVII, § 2. Ultimately, he did not rule on the report and recommendation; instead, he determined that this case presents a novel question of Washington constitutional interpretation and certified the question to this

---

[3] When § 2 was adopted, a "patent" was defined as "[a] grant of some privilege, property, or authority, made by the government or sovereign of a country to one or more individuals" and "[t]he instrument by which a state or government grants public lands to an individual." BLACK'S LAW DICTIONARY 877 (1st ed. 1891).

court.

## II. ANALYSIS

This court may determine a question certified from federal court involving an issue of state law that "has not been clearly determined and does not involve a question determined by reference to the United States Constitution." RAP 16.16(a); RCW 2.60.020. Certified questions are matters of law we review de novo. *Carlsen v. Glob. Client Sols., LLC*, 171 Wn.2d 486, 493, 256 P.3d 321 (2011). We consider such certified questions "not in the abstract but based on the certified record provided by the federal court." *Id.* (citing RCW 2.60.030(2)).

Whether the right-of-way under the 1875 Right-of-Way Act was a conveyance "patented by the United States" under art. XVII, § 2 of the Washington State Constitution is a question of constitutional interpretation. "When interpreting constitutional provisions, we look first to the plain language of the text and will accord it its reasonable interpretation." *Wash. Water Jet Workers Ass'n v. Yarbrough*, 151 Wn.2d 470, 477, 90 P.3d 42 (2004) (citing *Anderson v. Chapman*, 86 Wn.2d 189, 191, 543 P.2d 229 (1975)). The words must be given their common and ordinary meaning. *Id.* (citing *State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 557, 452 P.2d 943 (1969)).

If the constitutional language is clear and unambiguous, judicial interpretation is improper; but if the language is unclear and ambiguous, judicial interpretation is

an essential responsibility of the courts. *O'Connell*, 75 Wn.2d at 557-58 (citing *State*

*ex rel. Swan v. Jones*, 47 Wn.2d 718, 289 P.2d 982 (1955)). "In determining the

meaning of a constitutional provision, the intent of the framers, and the history of

events and proceedings contemporaneous with its adoption may properly be

considered." *Yelle v. Bishop*, 55 Wn.2d 286, 291, 347 P.2d 1081 (1959). This

certified question has not been previously resolved by this court.

The federal government does not have an absolute right to grant shoreland.

*Montana v. United States*, 450 U.S. 544, 551, 101 S. Ct. 1245, 67 L. Ed. 2d 493

(1981). When Washington became a state in 1889, it included an article in the

Washington State Constitution specifically addressing its special interest in

shoreland. *See* WASH. CONST. art. XVII. Article XVII, section 1 (hereinafter § 1)

reads,

> The state of Washington asserts its ownership to the beds and shores of
> all navigable waters in the state up to and including the line of ordinary
> high tide, in waters where the tide ebbs and flows, and up to and
> including the line of ordinary high water within the banks of all
> navigable rivers and lakes: *Provided*, that this section shall not be
> construed so as to debar any person from asserting his claim to vested
> rights in the courts of the state.

In short, Washington asserted its ownership over the beds and shorelands of

navigable waters at statehood.

But art. XVII, § 2 (hereinafter § 2) is a disclaimer. It reads, "The state of

Washington disclaims all *title* in and *claim* to all tide, swamp and overflowed lands,

7

*patented by the United States*: *Provided*, the same is not impeached for fraud." § 2 (emphasis added). Thus, the state constitution carved out an exception to Washington's general ownership over shorelands, disclaiming ownership of lands patented by the United States. If "the claimant under the federal patent at the time of statehood had made proof of all facts necessary to cause the patent to issue," then § 2 "operates as a grant to the claimant." *Anderson v. Olson*, 77 Wn.2d 240, 243-44, 461 P.2d 343 (1969).

In other words, if King County has made proof of all facts necessary to show that the right-of-way was a conveyance patented by the United States, then it was granted to SLS&E and now belongs to King County. However, if the right-of-way was not patented, then Washington asserted ownership over it in § 1, and it now belongs to the Abernathys. We find that King County did not adequately show that the right-of-way was a patent. Rather, the evidence shows that the right-of-way was an easement, which does not rise to the level of a patent and was not disclaimed by Washington under § 2.

A.    Patents Convey Fee Ownership

The 1875 Right-of-Way Act provided that "[t]he right of way through the public lands of the United States is granted to any railroad company" meeting certain requirements. 43 U.S.C. § 934. In order to obtain a right-of-way, a railroad could either construct an actual road or file a proposed map of its rail corridor with the

8

local office of the Department of the Interior prior to construction.  *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 98, 134 S. Ct. 1257, 188 L. Ed. 2d 272 (2014).  If the railroad did the latter, once the map was approved by the Department of the Interior, the right-of-way was noted on the land plats at the local office and any lands over which it passed would be "'disposed of subject to the right of way.'"  *Id.* (quoting 43 U.S.C. § 937).  There is no dispute that the 1875 Right-of-Way Act conveyed an easement, not fee ownership.  *See id.* at 103 (quoting *Great N. Ry. Co. v. United States*, 315 U.S. 262, 271, 62 S. Ct. 529, 86 L. Ed. 836 (1942)).

Section 2 disclaims "title" and "claims" to shorelands that were patented by the United States.  When interpreting constitutional provisions, the words must be given their common and ordinary meaning.  *Wash. Water Jet Workers Ass'n*, 151 Wn.2d at 477 (citing *O'Connell*, 75 Wn.2d at 557).  When § 2 was adopted, the words "title" and "claim" related to fee ownership of land, not easements.  *See* BLACK'S LAW DICTIONARY 209, 1174 (1st ed. 1891).  Namely, "title" was defined as "the means whereby the *owner* of lands has the just possession of his property" and "owner" was "[t]he person in whom is vested the ownership, dominion, or *title* of property."  *Id.* at 1174, 861 (emphasis added).  Likewise, "claim" was defined as "the tract of land taken up by a preemptioner or other settler (and also *his possession* of the same)."  *Id.* at 209 (emphasis added); *see also Enoch v. Spokane Falls & N. Ry. Co.*, 6 Wash. 393, 394, 397, 33 P. 966 (1893) (describing settler's ownership as

a claim). Thus, the plain language of § 2 applies to prestatehood land patents conveying *fee title* (i.e., full possessory interest) to lands under navigable waters, not lesser interests in land, such as easements (i.e., nonpossessory interest).

Moreover, patents are associated with the transfer of fee ownership, not nonpossessory interests. The language in § 2 plainly disclaims *all title* to tide-, swamp-, and overflowed lands so long as they were *patented* by the federal government. We recognize that if the framers intended to disclaim Washington's ownership interest in shorelands to the holder of a federal easement, § 2 would not have used the term "patented." When § 2 was adopted, the word "patent" broadly referred to "[a] grant of some privilege, property or authority, made by the government or sovereign of a country to one or more individuals," but in the specific context of land patents, "patent" was defined as the "instrument by which a state or government *grants public lands* to an individual." BLACK'S LAW DICTIONARY, *supra*, at 877. *Black's Law Dictionary* also notes that "[i]n American Law," "patent" was additionally defined as the "instrument by which a state or government *grants public lands* to an individual." *Id.* (emphasis added). A government land grant was a transfer of fee ownership in public land from the government to a new owner. *See, e.g.*, *Great N.*, 315 U.S. at 273-75 (distinguishing the 1875 Right-of-Way Act from prior land grant statutes that conveyed fee title rather than an easement). Given the way the terms were understood in the late 1800s, we conclude that a patent, as used

in § 2, can convey no less than a grant of title to public lands, and not a nonpossessory interest like a right-of-way easement.

In addition, statutes that grant land patents tend to explicitly state that they grant patents and include a section describing the process for obtaining one. *See, e.g.*, Homestead Act of 1862, 43 U.S.C. § 164 (outlining procedures to receive a patent), § 171 (describing specific conditions when certain citizens may "acquire the absolute title by the purchase, and *be entitled to a patent* from the United States on the payment of the office fees and sum of money herein specified" (emphasis added)), *repealed by* the Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, tit. VII, § 702, 90 Stat. 2787; General Mining Act of 1872, 30 U.S.C. § 29 (setting forth specific conditions where "[a]ny person, association, or corporation authorized to locate a claim under . . . this title . . . may file in the proper land office an *application for a patent*" (emphasis added)); Preemption Act of 1841, 27th Cong., ch. 16, 5 Stat. 453 § 12 (detailing requirements for proof of settlement, including that "all assignments and transfers of the right hereby secured, prior to the issuing of the *patent*, shall be null and void" (emphasis added)).

In contrast, the 1875 Right-of-Way Act neither explicitly states that it grants patents—in fact, it never even uses the word "patent"—nor includes a process for receiving one. 43 U.S.C. § 934; *see also Brandt*, 572 U.S. at 103 (the 1875 Right-of-Way Act "'clearly grants only an easement, and not a fee'" (quoting *Great N.*,

11

315 U.S. at 271)). In sum, the 1875 Right-of-Way Act lacks the features of a congressional act granting patents.

Based on the plain and ordinary meaning of the language used in § 2, the 1875 Right-of-Way Act did not involve patented lands because it conveyed a right-of-way easement, whereas patents are used to convey fee ownership.

B. Section 2 Is Narrowly Construed

King County urges a broad construction of § 2, but we must give effect to the plain meaning of the constitutional text in light of the framers' intent. *Wash. Water Jet Workers*, 151 Wn.2d at 477; *Yelle*, 55 Wn.2d at 291. Again, § 2 disclaimed title only to land "patented by the United States."

> Where the words of a constitution are unambiguous and in their commonly received sense lead to a reasonable conclusion, it should be read according to the natural and most obvious import of its framers, without resorting to subtle and forced construction for the purpose of limiting or extending its operation.

*O'Connell*, 75 Wn.2d at 558. Conflating a railroad easement and a patent would require a forced construction of the plain language of § 2 and run contrary to the framers' intent. Consequently, we narrowly construe § 2, applying it only to prestatehood land patents from the federal government conveying *fee title* to land beneath navigable waters.

In addition to the plain language, several further considerations weigh in favor of narrow construction. First, to the extent Washington case law has analyzed the

12

language of § 2, it has construed it narrowly.  *E.g.*, *Wash. Boom Co. v. Chehalis Boom Co.*, 90 Wash. 350, 353-56, 156 P. 24 (1916).  Second, although a few federal cases have considered the 1875 Right-of-Way Act and other patents and suggested that the act may be "akin" to a patent, they have not done so in the context of § 2; we decline to import those decisions to this context because it would be inconsistent with the plain meaning of our constitution.  Third, the historical context and policy implications support a narrow construction of the term "patent."

Although no Washington case has yet directly addressed this issue, we have routinely applied a narrow construction of the § 2 disclaimer.  For instance, in *Washington Boom Co.*, 90 Wash. at 353-56, we held that § 2 did not apply to tidelands and a bed of a slough[4] running diagonally through a section of land patented to a railroad company.  We found that even if a section of land was patented by the United States, if the tidelands within that section of land were not identified or meandered[5] in a government survey, then such tidelands were not included in the patent and therefore not disclaimed by the state. *Id.* at 355.  We explained that grants of land by patent "'will not be enlarged by construction.'"  *Id.* (quoting *Hill v. Newell*, 86 Wash. 227, 229, 149 P. 951 (1915)).  "'The general rule of construction

---

[4] A "slough" is "[a]n arm of a river, flowing between islands and the main-land, and separating the islands from one another."  BLACK'S LAW DICTIONARY, *supra*, at 1102.

[5] "Meander" means "to follow a winding or flexuous course."  BLACK'S LAW DICTIONARY, *supra*, at 763.  A meander line follows the course of a river or stream in a land survey. *Id.*

13

applying to grants of public lands by a sovereignty to corporations or individuals is that the grant must be construed liberally as to the grantor and strictly as to the grantee, and that nothing shall be taken to pass by implication.'" *Id*. (internal quotation marks omitted) (quoting *Hill*, 86 Wash. at 229); *accord Great N.*, 315 U.S. at 272 (quoting *Caldwell v. U.S.*, 250 U.S. 14, 20, 39 S. Ct. 397, 63 L. Ed. 816 (1919)).

Consequently, the title to the tidelands did not pass to the railroad company and, instead, "[t]he title to those shore lands and the bed of navigable waters remain[ed] in the state." *Wash. Boom. Co.*, 90 Wash. at 356. In other words, where the tidelands were not specifically identified by a meander line, the patent did not extend beyond the high-water point, and the shorelands and bed of the navigable stream were not included in the land grant. *Id.* Construing § 2 narrowly, this court does not infer an intent to include tidelands as part of the patented land absent their specific inclusion. *See generally id.*[6]

King County contends that two early cases of this court support its broader reading of § 2 patents extending to easements, but neither case is persuasive. First,

---

[6] Since 1892, we have consistently applied this narrow construction of § 2, finding tidelands disclaimed only where they were specifically included in the grant. *See, e.g.*, *Cogswell v. Forrest*, 14 Wash. 1, 3, 43 P. 1098 (1896) ("The land was granted according to the official grant of the survey of such lands, and the plat itself and its notes, lines and descriptions become a part of the grant or deed by which they are conveyed, as much as if the description was written out on the face of the deed itself."); *Scurry v. Jones*, 4 Wash. 468, 469-70, 30 P. 726 (1892) (specific intent to convey title to tidelands because the land patent included certain tidelands in Elliott Bay).

King County argues that under *Kneeland v. Korter*, 40 Wash. 359, 364, 82 P. 608 (1905), the § 2 disclaimer should be broadly interpreted to include an easement like a right-of-way. Pl.'s Br. at 1, 54-56. Its reliance on *Kneeland* is misplaced. There, the court analyzed the application of § 2 within the call of a patent conveying *fee title* to a railroad. *Kneeland*, 40 Wash. at 361-62. We held that § 2 disclaimed the tidelands because the railroad's entitlement to the patent vested prior to statehood even though the patent itself was not issued until later. *Id.* at 366-67. That case was concerned with *when* the patent holder's rights vested, not whether an *ownership interest less than fee title*—such as an easement—that was conveyed by an instrument other than a patent would implicate § 2. *See id.* at 362-63, 366-67; *see also Narrows Realty Co. v. State*, 52 Wn.2d 843, 847-48, 329 P.2d 836 (1958) (though predecessor in title made all facts necessary for a patent prior to statehood, the § 2 disclaimer did not apply because the patent did not issue until after statehood). *Kneeland* is distinguishable from the case at hand. Here, we are analyzing the application of § 2 within the call of a conveyance of an *easement* to a right-of-way and the timing of the patent holder's rights vesting is not at issue.

Nor did *Enoch*, 6 Wash. at 397, hold that a right-of-way amounts to a patent. Although *Enoch* involved a right-of-way granted to a railroad company in the 1875 Right-of-Way Act, the issue was *when* the grant became effective for purposes of who held the right-of-way in the context of a takings claim, not whether the act

15

conveyed something more than an easement or how art. XVII would apply to the grant. *See generally Enoch*, 6 Wash. 393. King County argues that the act has the same effect as any other grant of land from the federal government because we held that the act "takes effect and becomes operative as a grant to a particular company only when it accepts its terms by a compliance with the conditions precedent prescribed in the act itself." *Id.* at 398. But we reject this reading of *Enoch* for two reasons. First, the court never equated a right-of-way to a patent nor did it equate an easement to a land grant (i.e., a conveyance of title to public land). *See generally Enoch*, 6 Wash. at 393. Second, the court did not analyze § 2 or any portion of art. XVII for that matter. *See generally id.* Instead, *Enoch* held that given the timing of when the land grant became effective, a private land owner could assert a takings claim and demand just compensation for the taking of the right-of-way. *Id.* at 398-402. Thus, *Enoch* does not assist in our analysis.

In addition, narrow construction of the § 2 disclaimer is consistent with federal case law. Most relevant is *Mann v. Tacoma Land Co.*, 153 U.S. 273, 14 S. Ct. 820, 38 L. Ed. 714 (1894). There, the lawsuit concerned a tract of tidelands in Commencement Bay. *Id.* at 283. The plaintiff filed a description and map of the land with the local land office under the Valentine Scrip Act, 17 Stat. 649. The Valentine Scrip Act covered public lands but did not include tidelands. *Id.* at 284. The land office issued a certificate to the plaintiff that would have entitled him to a

16

patent once the land was surveyed by the federal government.  However, the United

States Supreme Court held that under § 2, there was no right to a patent for the

tidelands; the land officer did not have the authority to approve an application for

the tract of tidelands.  *Id.* at 286.  The court explained that

> it cannot be supposed that the State of Washington, when it excluded
> from its claim of title lands which the government had in the due
> administration of its land department disposed of by a patent, meant
> thereby to exclude every tract for which a local land officer might
> wrongfully issue a receiver's receipt.

*Id.*  In other words, § 2 disclaims only tidelands or shorelands that were included in

the survey of a tract of land that was properly disposed of by patent.  That case stands

for the proposition that there is a high threshold to obtain a right to a patent of

tidelands.  Here, as in *Mann*, we find that § 2 does not disclaim an easement where

there was never a right to a patent.[7]

Moreover, historical context also supports our finding that the right-of-way

was not a conveyance patented by the federal government.  *See Yelle*, 55 Wn.2d at

---

[7] King County also points to several federal and out-of-state cases as support for the proposition that its easement amounts to a patent.  But none of those cases held that a right-of-way counts as a title or claim patented by the federal government or interpreted the text of the Washington Constitution.  *Great N.*, 261 U.S. at 125 (court stated that 1875 Right-of-Way Act map "is intended to be the equivalent of a patent," but case arose from out-of-state land dispute and did not interpret text of Washington Constitution); *Noble v. Union River Logging R.R. Co.*, 147 U.S. 165, 174-77, 13 S. Ct. 271, 37 L. Ed. 123 (1893) (court compared 1875 Right-of-Way Act map to a patent, but never held that a right-of-way equates to a patent); *Stepan v. N. Pac. Ry. Co.*, 81 Mont. 361, 369, 263 P. 425 (1928) (court stated that 1875 Right-of-Way Act grants more than an easement, but statement is incorrect under *Brandt*, 572 U.S. at 108); *Chambers v. Atchison, Topeka & Santa Fe Ry. Co.*, 32 Ariz. 102, 104-11, 255 P. 1092 (1927) (court found railroad was entitled to patent under 1866 statute absent issuance, but statute was "land grant" statute conveying fee title, not mere easement).

291 ("In determining the meaning of a constitutional provision, the . . . history of events and proceedings contemporaneous with its adoption may properly be considered."). During the late 1800s, there was a political movement for the forfeiture of railroad land grants that stemmed from rising fears of land monopolies and a distrust of railroads and their practices. David Maldwyn Ellis, *The Forfeiture of Railroad Land Grants, 1867-1894*, 33 MISS. VALLEY HIST. REV. 27, 34-36 (1946). Specifically, the constitution's framers were distrustful of railroads due to increased awareness that the railroad companies were failing to fulfill its promise to build railroads in exchange for the lands granted to it by the federal government. *Id.* at 29-30, 34-36; *see also* ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION 231 (2d ed. 2013) ("Many feared that leaving this issue [of the future sale of tidelands] to lawmakers would lead to legislative corruption by corporate interests seeking sweetheart deals on tidelands.").

Thus, by the time Washington became a state, there was growing skepticism of railroad companies, so we infer that the framers meant what they said in art. XVII—that the state owned the tidelands except for those patented by the federal government, but not any more than that. *See also* WASH. CONST. art. XII (reflecting limitations the framers placed on the influence of railroad companies, such as declaring all railroads common carriers subject to legislative control, prohibiting railroads from discriminatory charges between companies and persons, and

18

authorizing the legislature to correct abuses and prevent discrimination and extortion in railroad rates).

Finally, with respect to policy implications, if § 2 applies to 1875 Right-of-Way Act easements, Washington could lose many miles of shorelands and tidelands and face countless lawsuits by private owners who paid for land they never received. This group of property owners who did not foresee any objections to building on these shorelands would be forced to tear down their docks, boat lifts, decks, fences, and other structures and would shoulder the burden of paying for all of it. Such a burden is not adequately supported by the law.

The 1875 Right-of-Way Act granted a right-of-way, whereas the plain language of § 2 disclaims title to lands patented to the United States, where fee ownership is granted. And the weight of authority supports a narrow interpretation of § 2. Accordingly, we find that the right-of-way was not a patent, and as a result, Washington never disclaimed the land.

## III. CONCLUSION

We answer the certified question in the negative. We hold that the right-of-way approved by the United States Department of the Interior under the General Railroad Right-of-Way Act of 1875, 43 U.S.C. §§ 934-939, was *not* a conveyance "patented by the United States" under art. XVII, § 2 of the Washington State Constitution. It is undisputed that the right-of-way granted by the United States in

the 1875 Right-of-Way Act was an easement, not fee ownership, and following the common and ordinary meaning of the terms used in the constitution, we conclude that patents apply to the conveyance of title in fee ownership, not lesser nonpossessory interests in land. In addition to this plain meaning analysis, the 1875 Right-of-Way Act lacks the explicit language typically used to create patents, and our courts have construed § 2 narrowly. Thus, the 1875 Right-of-Way Act conveyed a right-of-way without patenting the shoreland to the railroad company, and Washington did not disclaim its ownership of the tidelands.

_____
Montoya-Lewis, J.

WE CONCUR:

_____       _____
González, C.J.                                                Stephens, J.

_____       _____
Johnson, J.                                                      Gordon McCloud, J.

_____       _____
Madsen, J.                                                       Yu, J.

_____       _____
Owens, J.                                                        Melnick, J.P.T.

20